156 P.3d 265 (2007)
STATE of Washington, Respondent,
v.
Daniel Norman AGUE-MASTERS, Appellant.
No. 34109-3-II.
Court of Appeals of Washington, Division 2.
April 17, 2007.
*269 Thomas Edward Doyle, Hansville, WA, Patricia Anne Pethick, Tacoma, WA, for Appellant.
James C. Powers, Thurston County Prosecuting Attorney Office, Olympia, WA, for Respondent.
HOUGHTON, C.J.
¶ 1 Daniel Ague-Masters[1] appeals his conviction of unlawful manufacture of methamphetamine in the presence of a minor while armed with a deadly weapon. He assigns error to (1) the trial court's failure to file suppression hearing findings of fact and conclusions of law, (2) the trial court's denial of his motion to suppress, (3) the sufficiency of the evidence for his sentence enhancements, and (4) his sentence. Pro se, he also challenges the denial of his right of allocution. We affirm his conviction, vacate his sentence enhancements and the DNA collection fee provision, and remand for resentencing.

FACTS
¶ 2 On March 31, 2001, Thurston County Sheriff's Deputy Jason Casebolt ran a records check for a vehicle located on Ague's property. The report stated that the registered owner, John Steven Hamm, had an outstanding felony warrant for escape. Casebolt contacted Detective Steve Hamilton, asking him for assistance in locating Hamm.
¶ 3 When Hamilton arrived, the deputies drove to Ague's residence, a single-wide mobile home, through an open cattle gate and down an unobstructed driveway approximately 50 to 75 feet before parking approximately 150 feet from the residence. Casebolt saw a sign in a tree that said "something to the effect of keep out or no trespassing or no hunting," but Hamilton and a corrections officer on a ride-along with Casebolt did not see the sign. Report of Proceedings (RP) (Nov. 19, 2001 a.m. session) at 14 (located in Apr. 25, 2001 RP). The deputies entered the property during daylight hours while in full uniform.
¶ 4 The deputies walked to the front door, and Casebolt knocked on the door for about a minute to a minute and one-half before hearing a noise from behind the residence. The deputies followed the noise through an open yard to the back of the residence.
¶ 5 While in the backyard, the deputies noticed a strong smell of propane. They saw *270 three new propane tanks with the valves turned open and believed that someone was purging them of their contents.
¶ 6 Also in the backyard, the deputies saw a man, whose height and weight was consistent with Hamm's, welding a vehicle's bumper. The deputies asked the man if Hamm was present. The man initially responded he did not know but then said he would contact the residence's occupants to find out.
¶ 7 The man walked to the back porch, began knocking on the door, and said, "Come open up; it's Steve." RP (Nov. 19, 2001 a.m. session) at 20. Once the back door opened, the man "quickly tried to bolt inside the residence." RP (Nov. 19, 2001 a.m. session) at 68. The deputies grabbed the man and handcuffed him before he could get inside.
¶ 8 The deputies asked the man to identify himself, but he gave evasive responses. It started to rain, so the deputies moved him to a patrol car. Ague's daughter, S.A., yelled to the deputies that she lived at the residence and wanted them to leave.
¶ 9 Casebolt continued questioning the man, asking him if he had any weapons. After the man said no, Casebolt performed a pat-down search. Casebolt felt what appeared to be a "large knife" inside the man's jacket. RP (Nov. 19, 2001 a.m. session) at 26-27. To access the knife from the man's pocket, Casebolt had to pull out a pill bottle, which contained 150-200 pseudoephedrine pills prescribed for a female name. The deputies also found the man's identification card, which indicated that he was not Hamm, and a records search of the name on the card did not reveal any outstanding warrants. After the deputies determined the man was not Hamm, they released him and returned the pill bottle.
¶ 10 The next day, Hamilton heard from an anonymous source that Steven Layton was bragging that he had fooled police. Hamilton obtained a booking photo of Layton and realized that Layton was the man he had questioned at Ague's residence. He also discovered that Layton had not appeared for sentencing on previous convictions of unlawful possession of methamphetamine with intent to deliver, first degree unlawful possession of a firearm, and attempted unlawful manufacturing of methamphetamine.
¶ 11 On April 2, Hamilton telephoned a judge to obtain a warrant to search Ague's property for items associated with methamphetamine manufacture. For support, he informed the judge: (1) about his encounter with Layton; (2) about Layton's criminal background; (3) about the pseudoephedrine pills Casebolt found; (4) about the heavy scent of propane in Ague's backyard; (5) that methamphetamine manufacturers may purge propane bottles in order to store anhydrous ammonia; (6) that anhydrous ammonia and pseudoephedrine pills are both primary precursors for manufacturing methamphetamine; and (7) about other suspects he believed lived at the residence based on an anonymous informant's tip. The judge authorized the warrant.
¶ 12 The deputies served the search warrant in the early morning of April 3. When they arrived, Ague opened the door wearing only underwear and appearing surprised, as if he had just awakened. The deputies found three other adults and one minor, S.A., in the house.
¶ 13 There were several outbuildings, travel trailers, and vehicles on the property. The deputies kicked in the door of a detached shed approximately 100 feet from the residence and, once inside, found items associated with a methamphetamine lab, including anhydrous ammonia and several containers with substances that tested positive for methamphetamine.
¶ 14 The shed also contained a washing machine full of wet clothing, a dryer, a freezer, a shower, a desk, a police scanner, and a monitor for a surveillance system. The residence and shed shared a grass yard that someone had recently mowed. The deputies taped off a hazardous area around the shed, which they described as the "hot zone." II RP at 42. The residence was outside the hot zone.
¶ 15 The deputies did not find any evidence of a methamphetamine lab inside the house, but they did find a "large" dial-operated gun safe in a bedroom. II RP at 154. A locksmith opened the safe, which contained six *271 shotguns, two rifles, four handguns, ammunition, batteries, baggies containing a white substance, a scale, and a box of syringes. All of the firearms were unloaded.
¶ 16 The State charged Ague with one count of unlawful manufacture of methamphetamine[2] with special allegations that he did so while armed with a deadly weapon[3] and while a minor was present in or on the manufacturing premises.[4]
¶ 17 Before trial, Ague moved to suppress evidence seized during the search, challenging the deputies' entry onto the property, the search warrant affidavit, and the probable cause for the warrant. The trial court found that the deputies had legitimate business on the property and only entered areas impliedly open to the public. The trial court excised portions of the search warrant affidavit dealing with the home's residents other than Layton because there was an insufficient showing of the informant's reliability. After excising these portions, the trial court found that the remainder of the affidavit was sufficient to establish probable cause for the search warrant and denied the motion to suppress.
¶ 18 A jury trial began on September 6, 2005. After the parties rested, Ague objected to both special allegations going to the jury, arguing insufficient evidence, but the trial court submitted them. With regard to the enhancement for a minor being on the premises, the trial court stated, "I am comfortable with the idea that premises in this regard could mean anywhere on the property under the control of the defendant and not necessarily within the same room that the meth was being cooked within." III RP at 206.
¶ 19 The jury found Ague guilty of manufacturing methamphetamine and found he was armed with a deadly weapon during the commission of the offense and that a minor was in or on the premises of manufacture.
¶ 20 Ague's standard sentencing range was 51 to 68 months, with a maximum term of 120 months. The court sentenced him to an additional 60 months for the minor-on-the-manufacturing-premises enhancement and 36 months for the deadly weapon enhancement. Because his total sentence exceeded the maximum term, the trial court sentenced him to 120 months. The trial court also imposed 9 to 12 months of community custody for each count and a $100 DNA collection fee.
¶ 21 On September 26, 2006, after trial and sentencing, the State submitted findings of fact and conclusions of law from the suppression hearing.
¶ 22 Ague appeals.

ANALYSIS

ENTRY OF FINDINGS OF FACT AND CONCLUSIONS OF LAW
¶ 23 First, Ague asks us to dismiss his case because the trial court did not enter findings of fact and conclusions of law after his suppression hearing. Although the trial court delayed entering the required findings and conclusions until after Ague submitted his opening appellate brief, the delay did not prejudice him or affect our ability to conduct appellate review.[5]See State v. Hoffman, 116 Wash.2d 51, 95, 804 P.2d 577 (1991). We decline to dismiss on these grounds.

MOTION TO SUPPRESS
¶ 24 Next, Ague claims the trial court erred in denying his motion to suppress. He asserts that the deputies unlawfully entered his property and searched Layton, and he claims that the search warrant affidavit was stale and did not provide probable cause.

A. AGUE'S EXPECTATION OF PRIVACY
¶ 25 Ague contends that the deputies unlawfully entered his property because they *272 were not conducting legitimate police business and were on areas not impliedly open to the public.
¶ 26 We review a trial court's denial of a motion to suppress by considering whether substantial evidence supports the challenged findings and whether those findings support the trial court's conclusions of law. State v. Ross, 106 Wash.App. 876, 880, 26 P.3d 298 (2001). "Substantial evidence is `evidence sufficient to persuade a fair-minded, rational person of the truth of the finding.'" State v. Levy, 156 Wash.2d 709, 733, 132 P.3d 1076 (2006) (quoting State v. Mendez, 137 Wash.2d 208, 214, 970 P.2d 722 (1999)). We review conclusions of law de novo, and unchallenged findings become verities on appeal. Levy, 156 Wash.2d at 733, 132 P.3d 1076.
¶ 27 Warrantless searches are per se unreasonable under the Fourth Amendment unless they fall within a few specific and well-delineated exceptions. State v. Ross, 141 Wash.2d 304, 312, 4 P.3d 130 (2000). Although residents maintain an expectation of privacy in the curtilage, or area contiguous with a home, "police with legitimate business may enter areas of the curtilage which are impliedly open, such as access routes to the house," so long as they do so as would a "reasonably respectful citizen." State v. Seagull, 95 Wash.2d 898, 902, 632 P.2d 44 (1981) (footnote omitted). Under the open view doctrine, when an officer is lawfully present in an area, his detection of items by using one or more of his senses does not constitute a search within the meaning of the Fourth Amendment. Seagull, 95 Wash.2d at 901, 632 P.2d 44.
¶ 28 Whether a portion of the curtilage is impliedly open to the public depends on the totality of the circumstances surrounding the deputies' entry. Seagull, 95 Wash.2d at 902-03, 632 P.2d 44. An access route is impliedly open to the public, absent a clear indication that the owner does not expect uninvited visitors. See Ross, 141 Wash.2d at 312, 4 P.3d 130; see also State v. Hornback, 73 Wash.App. 738, 743, 871 P.2d 1075 (1994). "No trespassing" signs alone do not create a legitimate expectation of privacy, especially without additional indicators of privacy expectations such as high fences, closed gates, security devices, or dogs. See State v. Chaussee, 72 Wash.App. 704, 710, 866 P.2d 643 (1994). Entry during daylight hours is more consistent with that of a reasonably respectful citizen. See Ross, 141 Wash.2d at 314, 4 P.3d 130.
¶ 29 Before we can determine if the areas of the curtilage were impliedly open, we must address Ague's argument that the deputies were not on legitimate police business when they entered his property. Ross, 141 Wash.2d at 313, 4 P.3d 130. Entering property to speak with occupants as part of an investigation of a possible crime is legitimate police business. Ross, 141 Wash.2d at 313-14, 4 P.3d 130; Seagull, 95 Wash.2d at 902 n. 1, 632 P.2d 44. Here, the deputies saw a car on the property associated with a person who had an outstanding arrest warrant, and they entered the property to ask the occupants about the person. Substantial evidence supports the trial court's finding that the deputies were engaged in legitimate police business.
¶ 30 Ague next argues that the deputies exceeded the scope of implied invitation by driving past a "No trespassing" sign and walking to the backyard. Here, the deputies entered the property during daylight hours and drove through an open, unlocked gate, proceeding down an unobstructed driveway. Although Casebolt saw what could have been a "No trespassing" sign, two other officers did not see it. One deputy knocked on the front door but no one answered and, after hearing a noise, the deputies followed the noise through an open yard to where they found Layton.
¶ 31 Substantial evidence also supports finding that a reasonable, respectful citizen would believe that he could drive through the open gate and down the driveway to the area where the deputies stopped, despite the possible presence of the sign in the tree. Additionally, a reasonable, respectful citizen seeking to contact an occupant would believe he could follow the deputies' same unobstructed path to the backyard. The deputies did not *273 exceed the scope of implied invitation while on Ague's property.

B. Search of Layton
¶ 32 Next, Ague challenges the patdown search of Layton after the deputies detained him. The trial court found that Ague did not have standing to challenge this search. The trial court is correct.
¶ 33 Ague cannot claim a privacy interest in Layton's person or the pill bottle found in his jacket.[6]See State v. Goucher, 124 Wash.2d 778, 787, 881 P.2d 210 (1994). Without a personal privacy interest, Ague has no standing to challenge the deputies' search of Layton.[7]

C. Probable Cause for Warrant
¶ 34 Ague next contends that the modified affidavit, which omits the portions the trial court excised, failed to establish probable cause to issue the search warrant.
¶ 35 We review an issuing magistrate's determination of probable cause for abuse of discretion, resolving all doubts in favor of the warrant's validity. State v. Maddox, 152 Wash.2d 499, 509, 98 P.3d 1199 (2004). A trial court abuses its discretion when its decision is "manifestly unreasonable or based upon untenable grounds or reasons." State v. Brown, 132 Wash.2d 529, 572, 940 P.2d 546 (1997).
¶ 36 An affidavit establishes probable cause if it sets forth sufficient facts to lead a reasonable person to conclude there is a probability that criminal activity has taken place and that evidence of the criminal activity can be found at the place to be searched. Maddox, 152 Wash.2d at 509, 98 P.3d 1199. "In determining probable cause, the magistrate makes a practical, commonsense decision, taking into account all the circumstances set forth in the affidavit and drawing commonsense inferences." Maddox, 152 Wash.2d at 509, 98 P.3d 1199.
¶ 37 Here, the affidavit without the information the trial court excised provided that Layton, who had an existing felony warrant, possessed a pill container with 150-200 pseudoephedrine pills prescribed for a female. Layton responded evasively and furtively to the deputies' questions. Three propane tanks were on the back porch of the residence, and the strong smell of propane led the deputies to believe someone was purging them. The affidavit also included an officer's statement that drug manufacturers use purged propane tanks to store anhydrous ammonia and that that pseudoephedrine and anhydrous ammonia are primary precursors for methamphetamine manufacture.
¶ 38 The facts alleged in the affidavit, absent the excised portions, sufficiently support a conclusion that criminal activity was taking place and that evidence of criminal activity was on the property. Accordingly, the redacted affidavit established probable cause to issue the search warrant.

D. Staleness
¶ 39 Ague also argues that the information in the affidavit was stale because there was no indication Layton would still be at the property at the time of the search, three days after the deputies' initial contact with him.
¶ 40 In evaluating whether the facts underlying a search warrant are stale, we look at the totality of the circumstances. Maddox, 152 Wash.2d at 506, 98 P.3d 1199. "The length of time between issuance and execution of the warrant is only one factor to consider along with other relevant circumstances, including the nature and scope of the *274 suspected criminal activity." Maddox, 152 Wash.2d at 506, 98 P.3d 1199.
¶ 41 The information in the affidavit was not stale. Only two days elapsed from the time the deputies first encountered Layton on the property and when they served the warrant. The deputies found pseudoephedrine pills on Layton and what appeared to be purging propane tanks in the yard, which suggested that any manufacturing could be in its early stages. It was reasonable to assume that the methamphetamine manufacturing process would be ongoing when the deputies served the warrant. The trial court did not err in denying Ague's motion to suppress.

SENTENCING UNDER FORMER RCW 69.50.401(A)(1)(II) (2000)
¶ 42 Ague further contends that the trial court erred in sentencing him under former RCW 69.50.401(a)(1)(ii) (2000) because the jury did not identify the particular form of methamphetamine underlying the conviction. He also argues that his counsel was ineffective for not raising the issue before the trial court.
¶ 43 Our Supreme Court held that former RCW 69.50.401(a)(1)(ii) encompasses all forms of methamphetamine in State v. Cromwell, 157 Wash.2d 529, 536-37, 140 P.3d 593 (2006).[8] Although the court addressed the 2002 version of the statute, that version is the same as the version in effect when Ague committed his crime. When our Supreme Court construes a statute, it clarifies the statute's original meaning. In re Pers. Restraint of Greening, 141 Wash.2d 687, 693 n. 7, 9 P.3d 206 (2000). The trial court did not err when it sentenced Ague under former RCW 69.50.401(a)(1)(ii). Furthermore, because the trial court did not err, Ague cannot show that his counsel provided ineffective assistance for failing to challenge the court's sentencing procedure. See State v. Hendrickson, 129 Wash.2d 61, 77-78, 917 P.2d 563 (1996).

SUFFICIENCY OF THE EVIDENCE FOR ENHANCEMENTS
¶ 44 Ague next contends that the evidence was insufficient to support his deadly weapon and minor-on-the-manufacturing-premises sentence enhancements. We address each enhancement in turn.
¶ 45 The test for determining the sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the State, any rational fact finder could have found guilt beyond a reasonable doubt. State v. Salinas, 119 Wash.2d 192, 201, 829 P.2d 1068 (1992). An insufficiency claim admits the truth of the State's evidence and any reasonable inferences from it. Salinas, 119 Wash.2d at 201, 829 P.2d 1068. We defer to the fact finder on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence. State v. Thomas, 150 Wash.2d 821, 874-75, 83 P.3d 970 (2004).

A. Deadly Weapon Enhancement
¶ 46 Ague challenges his deadly weapon enhancement, contending that insufficient evidence established that he was "armed" for purpose of former RCW 9.94A.125 (2000).
¶ 47 Whether a person is armed is a mixed question of law and fact, which we review de novo. State v. Schelin, 147 Wash.2d 562, 565-66, 55 P.3d 632 (2002). "`A person is "armed" if a weapon is easily accessible and readily available for use, either for offensive or defensive purposes,'" and there is a connection or nexus between the defendant, the weapon, and the crime. State v. Easterlin, 159 Wash.2d 203, 208-09, 149 P.3d 366 (2006) (quoting State v. Valdobinos, 122 Wash.2d 270, 282, 858 P.2d 199 (1993)); also compare Valdobinos, 122 Wash.2d at 273-74, 282, 858 P.2d 199 (defendant not armed where police arrested him then searched house, finding cocaine under a bed and a rifle under a bed) and State v. Call, 75 Wash.App. 866, 867-69, 880 P.2d 571 (1994) (defendant not armed where he walked into bedroom to get identification and police later found two unloaded guns and a loaded gun in a toolbox in the bedroom) with *275 Schelin, 147 Wash.2d at 564, 574-75, 55 P.3d 632 (defendant armed where police found him at the bottom of stairs six to ten feet away from loaded revolver in a holster hanging on a nail). "`[M]ere constructive possession [of a deadly weapon] is insufficient to prove a defendant is "armed" with a deadly weapon during the commission of a crime.'" State v. Gurske, 155 Wash.2d 134, 138, 118 P.3d 333 (2005) (quoting Schelin, 147 Wash.2d at 567, 55 P.3d 632) (internal quotation marks omitted).
¶ 48 Valdobinos and Schelin also provide guidance as to what establishes a nexus between the firearm and the defendant. Gurske, 155 Wash.2d at 141, 118 P.3d 333. In Valdobinos, there was no evidence that defendant was in close proximity to the weapon when police discovered it or when availability for use for defensive or offensive purposes was important. 122 Wash.2d at 282, 858 P.2d 199. But in Schelin, the defendant was close to the easily accessible and readily available weapon at the time police entered the house. 147 Wash.2d at 574-75, 55 P.3d 632. Although proximity of the defendant to the weapon has played into the nexus analysis, it is possible for a defendant to be armed during a commission of a crime for purposes of a sentence enhancement even if not arrested in close proximity to the weapon. State v. Simonson, 91 Wash.App. 874, 877, 882-83, 960 P.2d 955 (1998) (defendant in jail when police found a loaded pistol, which had recently been dropped outside a methamphetamine lab, and other evidence suggesting that defendant and an accomplice had been manufacturing methamphetamine for six weeks and during some or all of that time had seven guns on the premises, with at least four kept loaded, in order to protect the manufacturing site).
¶ 49 Finally, when determining the nexus between the weapon and the crime, we must examine "`the nature of the crime, the type of weapon, and the circumstances under which the weapon is found (e.g., whether in the open, in a locked or unlocked container, in a closet on a shelf, or in a drawer).'" Gurske, 155 Wash.2d at 142, 118 P.3d 333 (quoting Schelin, 147 Wash.2d at 570, 55 P.3d 632).
¶ 50 Here, the deputies detained and handcuffed Ague outside his front door. There was a methamphetamine lab in a detached shed 100 feet from the house but no evidence of a lab in the house. The deputies did not find any firearms in the shed but found 12 unloaded firearms and drug paraphernalia locked in a safe in the house. The deputies had already arrested Ague when they found the unloaded firearms in the safe. There was no evidence Ague attempted to use or had used one of the firearms for offensive or defensive purposes.
¶ 51 The State argues that the firearms were easily accessible because had Ague chosen to use them, he could have opened the safe, loaded one of them, and used it. But Washington courts have found that a defendant is not "armed" even though he, presumably, could have obtained a weapon by taking a few steps. See Valdobinos, 122 Wash.2d at 282, 858 P.2d 199; State v. Johnson, 94 Wash.App. 882, 894-95, 897, 974 P.2d 855 (1999); Call, 75 Wash.App. at 869, 880 P.2d 571.
¶ 52 The State also compares this case with Simonson, arguing that the fact finder could reasonably infer that the firearms were part of a defense system for the methamphetamine lab. But although there was a surveillance system monitor in the shed, there were no firearms in the shed. Unlike Simonson, there was no evidence of a firearm that someone had recently used or other loaded firearms that had been present in the manufacturing lab. 91 Wash.App. at 877-78, 960 P.2d 955. Rather, the firearms were located in a safe in the house 100 feet away from the methamphetamine lab.
¶ 53 The evidence is insufficient to show that the firearms in the safe were easily accessible and readily available, and Ague's constructive possession of the firearms is not enough to show he was "armed" for purposes of former RCW 9.94A.125. Accordingly, we vacate his deadly weapon enhancement.

B. Minor in or on the Premises of Manufacture
¶ 54 Next, Ague argues that there was insufficient evidence to show he manufactured *276 methamphetamine while a minor was in or on the premises of manufacture.
¶ 55 When a jury convicts a defendant of manufacturing methamphetamine, he may be subject to a sentence enhancement if "a person under the age of eighteen was present in or upon the premises of manufacture." Former RCW 9.94A.128(1), (2) (2000). The State must plead the charge in a special allegation and prove it beyond a reasonable doubt. Former RCW 9.94A.128(2).
¶ 56 Ague contends that evidence was insufficient to show that S.A. was under the age of 18. But three deputies testified that S.A. was a juvenile, including one who expressly stated that S.A. appeared to be 12 or 13 years old. Considering all of the evidence in the light most favorable to the State and giving proper deference to the jury's credibility determinations, there was sufficient evidence to show that S.A. was under 18 years old. See Thomas, 150 Wash.2d at 874-75, 83 P.3d 970.
¶ 57 Ague next contends that the evidence was insufficient to prove that S.A. was in or on the premises of manufacture. He argues that there is no evidence she was ever in the shed and that proving she was anywhere on the property is not the same as proving she was present at the manufacturing location. The State argues that evidence showing S.A. was in the residence or walking on the property when the deputies were present is sufficient for the allegation. Both parties essentially dispute the definition of "premises of manufacture" and cite State v. Poling, 128 Wash.App. 659, 116 P.3d 1054 (2005), in support of their arguments.
¶ 58 Statutory interpretation is a question of law we review de novo. State v. Tracy, 128 Wash.App. 388, 395, 115 P.3d 381 (2005), aff'd, 158 Wash.2d 683, 147 P.3d 559 (2006). When a statute is ambiguous, we resort to principles of statutory construction, legislative history, and relevant case law to assist in interpretation. State v. Watson, 146 Wash.2d 947, 955, 51 P.3d 66 (2002). An ambiguous statute is one which different parties can reasonably interpret in more than one way. State v. Roggenkamp, 153 Wash.2d 614, 621, 106 P.3d 196 (2005). In construing statutes, we must discern and give effect to the legislature's intent. Watson, 146 Wash.2d at 954, 51 P.3d 66.
¶ 59 In construing a criminal statute, the rule of lenity applies where two possible constructions are possible. See State v. Roberts, 117 Wash.2d 576, 586, 817 P.2d 855 (1991). The rule requires we construe the statute strictly against the State and in favor of the accused. State v. Mullins, 128 Wash.App. 633, 642, 116 P.3d 441 (2005). But we will not consider the rule of lenity when the statute is clear on its face. Mullins, 128 Wash.App. at 642, 116 P.3d 441.
¶ 60 The current version of RCW 9.94A.030 and the version in effect at the time Ague committed the crime do not define "premises of manufacture" or "premises." Although a standard dictionary defines the word "premises" in relevant part as "a specified piece or tract of land with the structures on it" and as "a building, buildings, or part of a building covered by or within the stated terms of a policy (as of fire insurance)," Webster's Third New Intern'l Dictionary 1789 (2002), the additional words "of manufacture" qualify its definition. As the literal meaning of the statute is unclear, we resort to legislative history and relevant case law to construe its meaning.
¶ 61 The original language proposed for former RCW 9.94A.128 would have required the State to prove beyond a reasonable doubt that "a person under the age of eighteen was present in or at the site or location of manufacture." S.B. 6260, 56th Leg., Reg. Sess. at 1 (Wash.2000) (first reading). But prior to passage, the legislature amended the language to require that a person under 18 years of age be "in or upon the premises rather than at the location." S.B. REP. on S.B. 6260, at 1, 56th Leg., Reg. Sess. (Wash. 2000). The statute received support because it was "an important step in protecting children" from the "risks of explosion and chemical toxicity." H.B. REP. on Substitute S.B. 6260, at 3, 56th Leg., Reg. Sess. (Wash.2000); S.B. REP. on Substitute S.B. 6260, at 2, 56th Leg., Reg. Sess. (Wash.2000). Testimony in support of the bill also referred to protecting children from parents who manufacture methamphetamine "in the same bathtubs *277 that their children bathe in and on the same kitchen counters that is [sic] used to prepare food for their children." H.B. REP. on Substitute S.B. 6260, at 3, 56th Leg., Reg. Sess. (Wash.2000).
¶ 62 Poling also provides guidance in interpreting the statute. In Poling, we found an instruction overly broad for purposes of former RCW 9.94A.128 because it defined "premises" to include "any building, dwelling, or real property." 128 Wash.App. at 670, 116 P.3d 1054. In support of our reasoning, we stated that being anywhere on a property where methamphetamine manufacturing occurs is not the same as being present on the manufacturing premises. Poling, 128 Wash. App. at 669-70, 116 P.3d 1054. Instead, for purposes of the special allegation of manufacturing methamphetamine with a minor in or on the premises of manufacture, the jury is required to find that "children were present at the manufacturing location, as contrasted with children being present but removed from the actual manufacturing process." Poling, 128 Wash.App. at 670, 116 P.3d 1054.
¶ 63 As the legislative history and relevant case law suggest, the purpose of the statute is to protect children from the possible harmful repercussions of manufacturing methamphetamine. Accordingly, the trial court's finding that "premises . . . could mean anywhere on the property under the control of the defendant" is too broad. III RP at 206. Instead, the inquiry should be whether a person under the age of 18 is in or on the "premises of manufacture" where the manufacturing took place such that they may be exposed to chemical toxicity and the explosion risk associated with the actual manufacturing process.
¶ 64 Here, police found S.A. in the house, but the methamphetamine lab was in a detached shed approximately 100 feet away. There was no evidence of methamphetamine manufacturing anywhere else on the property outside the shed. No evidence linked S.A. to the clothing in the shed or suggested that she used the shed or area around the shed. And importantly, the residence was outside the hot zone police taped off around the shed.
¶ 65 Considering the evidence in the light most favorable to the State and all reasonable inferences from it, the evidence was insufficient to find that S.A. was present in or on the premises of manufacture for purposes of former RCW 9.94.128.[9] We vacate Ague's sentence enhancements for manufacturing methamphetamine while a minor was in or on the manufacturing premises.

OTHER SENTENCING ISSUES
¶ 66 Ague next contends that the trial court erred in imposing (1) a 60 month sentence for the minor in or on the premises of manufacture enhancement,[10] (2) a $100 DNA collection fee, and (3) community custody that could theoretically exceed his maximum sentence.[11] The State concedes error on all these issues.[12] We accept the State's concessions.

DNA Collection Fee
¶ 67 Ague correctly argues that the trial court erred in imposing a $100 DNA collection fee under RCW 43.43.7541. Because RCW 43.43.7541 requires a fee for a felony *278 committed on or after July 1, 2002, and the statute was not effective when he committed his crime (on or about April 3, 2001), the trial court erred in imposing the fee. We remand for resentencing with instructions to strike this fee from his judgment and sentence.

STATEMENT OF ADDITIONAL GROUNDS (SAG), RAP 10.10

Right to Allocution
¶ 68 Pro se, Ague assigns error to the trial court's failure to afford him an opportunity to speak at his sentencing hearing. The State argues that he cannot raise this issue for the first time on appeal.
¶ 69 A trial court's failure to solicit a defendant's statement in allocution is a legal error. State v. Hughes, 154 Wash.2d 118, 153, 110 P.3d 192 (2005), overruled in part on other grounds, Washington v. Recuenco, ___ U.S. ___, 126 S.Ct. 2546, 165 L.Ed.2d 466 (2006). But Ague may not raise the right to allocution for the first time on appeal because his right of allocution is derived from state law and is not constitutional in nature. Hughes, 154 Wash.2d at 153, 110 P.3d 192. Under RAP 2.5(a)(3), we need not consider an issue that is not a "manifest error affecting a constitutional right" for the first time on appeal. Therefore, we decline to address this issue.
¶ 70 We affirm Ague's conviction, vacate the armed with a deadly weapon and minor-on-the-manufacturing-premises enhancements, and remand for resentencing.
We concur: VAN DEREN and PENOYAR, JJ.
NOTES
[1] Although Ague-Masters is officially his last name, he stated at trial that he prefers Ague.
[2] Former RCW 69.50.401(a)(1)(ii) (2000).
[3] Former RCW 9.94A.125 (2000), recodified as RCW 9.94A.602; former RCW 9.94A.310(3)(b) (2002), recodified as RCW 9.94A.510.
[4] Former RCW 9.94A.128 (2000), recodified as RCW 9.94A.605; former RCW 9.94A.310(6) (2002), recodified as RCW 9.94A.510.
[5] Additionally, Ague filed a supplemental brief in response to the entry of the findings of fact and conclusions of law from the suppression hearing.
[6] The State did not charge Ague with a crime of possession, so automatic standing is not available. See State v. Goucher, 124 Wash.2d 778, 787, 881 P.2d 210 (1994).
[7] As the trial court found, even if Ague had standing to challenge the search of Layton, the search was lawful. The deputies conducted a weapons patdown after concluding that Layton resembled Hamm, for whom there was a felony arrest warrant, and based on Layton's furtive behavior in their presence. See State v. Smith, 102 Wash.2d 449, 452, 688 P.2d 146 (1984) (officer who has probable cause to detain and question a person permitted to frisk the person for weapons if he has reasonable grounds to believe the person may be armed and presently dangerous).
[8] The Supreme Court filed the Cromwell opinion after Ague submitted his opening brief.
[9] Further, the rule of lenity applies here, requiring that we construe the statute strictly against the State and in Ague's favor. See Roberts, 117 Wash.2d at 586, 817 P.2d 855.
[10] Because we vacate Ague's sentence enhancement for manufacturing methamphetamine while a minor was in or on the manufacturing premises, we do not address his claim that the trial court erred in sentencing him on this enhancement.
[11] Because we vacate Ague's sentence enhancements, on remand the trial court may sentence him within the standard range for his offense, which is 51 to 68 months. Because the maximum sentence for his offense is 120 months, there is no possibility of his total time of confinement plus 9 to 12 months of community custody exceeding the maximum sentence. Accordingly, we need not address this claim.
[12] Ague asserts, arguendo, that if we decide he waived his challenge to his sentence enhancement for the minor-on-the-manufacturing-premises or his community custody terms, his counsel was ineffective for not addressing them at trial. Because we vacate the enhancement, we do not address his ineffective assistance of counsel claims.