COURT OF APPEALS DIV I
2017 FEB -6 AM 9: 35


# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 72553-0-I |
| Respondent, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | UNPUBLISHED OPINION |
| ADRIAN G. SASSEN VANELSLOO, | ) | |
| Appellant. | ) | FILED: February 6, 2017 |
| | ) | |

APPELWICK, J. — Sassen Vanelsloo argues that the dismissal of a sitting juror was error requiring a new trial. He contends that he must be resentenced, because the firearm enhancements are not supported by sufficient evidence. He argues that the State failed to prove that the shotgun was operable or that he was armed, where the shotgun was found in the rear cargo area of the car. We affirm but remand for a hearing on legal financial obligations.

## FACTS

On September 7, 2012, Athena Aardema had a court date. Her boyfriend, Adrian Sassen Vanelsloo, drove her to the courthouse in a black Kia sport utility vehicle (SUV). He picked her up afterward. They were on their way to Aardema's father's house when Sassen Vanelsloo took a right turn at a traffic light where no right turns were permitted on red lights.

Bellingham Police Officer Lewis Leake was monitoring traffic that morning. He observed the black Kia SUV turn right on the red light. Officer Leake activated his lights to pull over the Kia. However, as soon as he turned to follow the Kia, the Kia began moving very rapidly, trying to elude him. He followed the Kia through several intersections, as it moved erratically, forcing other cars to stop abruptly to avoid a collision.

In the middle of an intersection, Sassen Vanelsloo stopped the car, jumped out, and ran. When Officer Leake arrived at the car, he asked Aardema who had been driving the car. At first, she told him a man named Jesse was driving, because it was an alias Sassen Vanelsloo sometimes used. Eventually, Aardema admitted to Officer Leake that Sassen Vanelsloo was the driver of the car.

Officer Leake allowed Aardema to leave the scene. As he was helping her collect her personal belongings from the car, he noticed a gun in the rear cargo area. At that point, he decided to impound the car and request a search warrant. When the police officers later executed a search warrant of the Kia, they found several firearms, a backpack containing bags with controlled substances in them, drug paraphernalia, and multiple cell phones.

Bellingham police encountered Sassen Vanelsloo again on December 11, 2012. Sassen Vanelsloo was charged with unlawful possession of a controlled substance, attempting to elude a pursuing police officer, three counts of unlawful possession of a firearm in the first degree, and four counts of unlawful possession of a controlled substance with intent to deliver. The State also alleged that Sassen Vanelsloo was armed with a firearm—specifically, a 12 gauge shotgun—when he

committed the unlawful possession of a controlled substance and unlawful possession with intent to deliver offenses.

The jury found Sassen Vanelsloo guilty as charged. And, it found that he was armed with a firearm. The trial court imposed five firearm sentence enhancements. Sassen Vanelsloo appeals.

## DISCUSSION

Sassen Vanelsloo makes multiple arguments on appeal. He contends that the trial court erred in dismissing a sitting juror. He challenges the firearm enhancements, asserting that the State failed to prove that the shotgun was operable and that he was armed. He asserts that the trial court failed to inquire into his ability to pay before imposing legal financial obligations. In a statement of additional grounds, he argues that the convictions were supported by insufficient evidence, the prosecutor committed misconduct, the trial court erred by admitting portions of letters and telephone calls, and that cumulative error deprived him of a fair trial.

I. Dismissal of a Sitting Juror

Sassen Vanelsloo argues that the trial court erred in dismissing juror 12 based solely on her limited prior contact with a witness, Sharon Burton. He asserts that juror 12 did not indicate an inability to be fair and impartial, so she was fit to serve.

This court reviews a trial court's decision to dismiss a juror for an abuse of discretion. State v. Jorden, 103 Wn. App. 221, 226, 11 P.3d 866 (2000). RCW 2.36.110 provides,

> It shall be the duty of a judge to excuse from further jury service any juror, who in the opinion of the judge, has manifested unfitness as a juror by reason of bias, prejudice, indifference, inattention or any physical or mental defect or by reason of conduct or practices incompatible with proper and efficient jury service.

CrR 6.5 similarly states, "If at any time before submission of the case to the jury a juror is found unable to perform the duties the court shall order the juror discharged, and the clerk shall draw the name of an alternate who shall take the juror's place on the jury." Together, these provisions impose an ongoing duty on the trial court to excuse any juror who is unfit. Jorden, 103 Wn. App. at 227.

The trial court has discretion to hear and resolve issues regarding whether a sitting juror should be dismissed. Id. at 229. In acting in this capacity, the trial court has fact finding discretion. Id. This means that the judge may rely on his or her own observations in assessing the juror's credibility. Id.

Sharon Burton testified on Sassen Vanelsloo's behalf. Burton is the in-patient coordinator and drug and alcohol counselor for the Lummi Nation. Burton's testimony was critical to Sassen Vanelsloo's defense, because it placed him at her house during the morning of the chase.

After Burton's testimony, juror 12 told the bailiff that she was previously acquainted with Burton. The court brought juror 12 into the courtroom for questioning. Juror 12 revealed that Burton helped stage an intervention and find treatment for juror 12's nephew. The State asked juror 12 whether she had a

4

positive experience with Burton. Juror 12 recognized that Burton assisted her family in helping her nephew to go into treatment. But, she was unsure whether she would classify her interactions with Burton as a positive experience, stating, "[T]here was no good or bad, it was just all, you know, normal as it would be trying to just get the help I wanted for my family member." When the State pressed her on this, saying it sounds like she had a positive feeling about Burton, juror 12 resisted, ultimately saying, "I guess. It's not, I wouldn't call it from her. I'd call it from our own community for the help so that's what your tribe is for is to try to help the funds with our community people that need the assistance." Juror 12 also stated that she never socialized with Burton and probably would not remember her if she saw her again.

After this questioning, the court ruled,

> It's a close case, but I think I'm going to rule that the juror should be let go. Counsel points out correctly that Ms. Burton is a critical witness[. E]ven though there is not a real strong relationship between the juror and the witness[,] I think given the importance of the witness's role in the case it's appropriate for Juror 12 to be excused.

Sassen Vanelsloo compares this case to Hough v. Stockbridge, 152 Wn. App. 328, 216 P.3d 1077 (2009). There, the trial court denied a motion to dismiss a sitting juror who wrote a note suggesting that Hough had mental or emotional problems and should be evaluated. Id. at 340. On appeal, the court held that the record supported the judge's decision not to dismiss this juror, because the juror's note did not state that the juror could not be fair and impartial. Id. at 341.

5

Therefore, the trial court did not abuse its discretion in refusing to dismiss the juror. Id.

Sassen Vanelsloo argues that under Hough, a juror must suggest an inability to be fair and impartial before the trial court can dismiss the juror. We disagree. The Hough court was focused on whether the record supported the trial court's decision. Id. Because the record provided a tenable reason to deny the motion to dismiss the juror, the trial court did not abuse its discretion. Id.

Here too, we must focus on the record before the trial court. Juror 12 did not state that she could not be fair or impartial. In fact, she suggested that her interactions with Burton were minimal and unimportant. However, she also acknowledged that her tribe's support in helping her nephew get treatment had a positive effect on her. The trial court was in the best position to gauge juror 12's demeanor, facial expressions, and other nonverbal communications to assess whether she was biased. This court defers to the trial court's factual determinations. Jorden, 103 Wn. App. at 229. We conclude that the trial court did not abuse its discretion in dismissing juror 12.

II.  Operability of the Shotgun

Sassen Vanelsloo argues that there was insufficient evidence that the shotgun was operable, as necessary to support the firearm enhancements. He asserts that the State failed to produce evidence that the gun had ever been fired.

When faced with a sufficiency of the evidence challenge, this court asks whether, viewing the evidence in the light most favorable to the State, any rational trier of fact could have found guilt beyond a reasonable doubt. State v. Salinas,

119 Wn.2d 192, 201, 829 P.2d 1068 (1992). All reasonable inferences from the evidence are drawn in favor of the State. Id.

Sassen Vanelsloo's argument rests on State v. Recuenco, 163 Wn.2d 428, 180 P.3d 1276 (2008). The issue in Recuenco was whether a harmless error analysis was appropriate when the State did not submit a firearm enhancement to the jury. Id. at 433. The State charged Recuenco with a deadly weapon enhancement, and the jury found that Recuenco was armed with a deadly weapon. Id. at 431-32. But, the trial court imposed a firearm enhancement. Id. at 432. The Supreme Court vacated the firearm enhancement, because it was not charged, sought at trial, or found by the jury. Id. at 442. In reaching this holding, the majority responded to the dissent's argument that the State could seek the firearm enhancement at sentencing, because the only deadly weapon discussed at trial was a handgun. Id. at 437. The court rejected this argument:

> The dissent overlooks here that in order to prove a firearm enhancement, the State must introduce facts upon which the jury could find beyond a reasonable doubt the weapon in question falls under the definition of a "firearm": "a weapon or device from which a projectile may be fired by an explosive such as gunpowder." 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 2.10.01 (2d ed. Supp. 2005) (WPIC). We have held that a jury must be presented with sufficient evidence to find a firearm operable under this definition in order to uphold the enhancement. State v. Pam, 98 Wn.2d 748, 754-55, 659 P.2d 454 (1983), overruled in part on other grounds by State v. Brown, 111 Wn.2d 124, 761 P.2d 588 (1988).

Id.

Other divisions of this court have interpreted this language. In State v. Pierce, 155 Wn. App. 701, 713, 230 P.3d 237 (2010), the appellant was charged

7

with a deadly weapon enhancement, but the trial court sentenced him to a firearm enhancement. Division Two held that this was error, because under Recuenco, the State must present the jury with sufficient evidence to find a firearm operable. Id. at 714. Without evidence that the firearm was capable of firing a projectile, there was insufficient evidence that the firearm was operable.[1] Id.

In State v. Raleigh, 157 Wn. App. 728, 733, 238 P.3d 1211 (2010), the appellant argued that the State failed to prove he possessed a firearm, because it was not operable on the date the crime was committed. Division Two rejected Raleigh's argument, holding that the quoted language from Recuenco was nonbinding dicta. Id. at 735. The Raleigh court concluded that a firearm need not be operable during the commission of a crime to constitute a firearm. Id. at 734. The relevant question is rather whether the firearm is a gun in fact or a toy gun. Id.

Mostly recently, Division Three agreed that the statement from Recuenco is nonbinding dicta. State v. Tasker, 193 Wn. App. 575, 592, 373 P.3d 310 (2016). The Tasker court ruled that in order to be a firearm for purposes of RCW 9.41.010, "a device must be capable of being fired, either instantly or with reasonable effort and within a reasonable time. Evidence that a device appears to be a real gun and is being wielded in committing a crime is sufficient circumstantial evidence that it is a firearm." Id. at 594.

---

[1] Notably, the State in Pierce did not contend that it had presented sufficient proof of operability, arguing instead that it did not need to present the firearm itself. 155 Wn. App. at 714 n.11. The court noted that the firearm itself may not be necessary "when there is other evidence of operability, such as bullets found, gunshots heard, or muzzle flashes." Id.

We follow <u>Raleigh</u> and <u>Tasker</u> and conclude that a firearm must be capable of being fired instantly or with reasonable effort within a reasonable time. Here, the shotgun itself was introduced into evidence at trial. Officer Leake, who originally discovered the shotgun, testified. Officer Leake examined the shotgun and verified that it was a Mossberg Pistol Grip Pump Action 12 gauge shotgun. He explained that when he found the shotgun, it had a 12 gauge shell in the magazine, but not in the firing chamber. So, if someone wanted to use the shotgun, they would have to grab the weapon and pull the pistol grip forward to rack a shell into the firing chamber. Officer Leake also stated that based on his experience around firearms, having received stringent law enforcement training, that the shotgun is "a real authentic firearm capable of firing."

Officer Bernard Vodopich, who assisted in searching the Kia, also testified. He also identified the shotgun as the one that was found in the Kia. The State asked Officer Vodopich whether the shotgun appeared to be a fully functional firearm, and he responded that it did. He also confirmed that it is an object that is designed to propel a projectile through the explosion of gunpowder.

From this testimony, the jury could infer that the shotgun was capable of being fired with minimal effort. It was a real firearm, not a toy. While the State did not introduce evidence that the shotgun had been fired before, such evidence is not necessary to support a firearm enhancement.[2] We conclude that the finding that the shotgun was a firearm is supported by sufficient evidence.

---

[2] In fact, even if we were to adopt <u>Pierce</u>'s interpretation of <u>Recuenco</u>, <u>Pierce</u> does not suggest that operability turns on whether the gun had ever been fired before. Rather, <u>Pierce</u> suggests that evidence such as spent bullets,

III.    Armed with a Firearm

Sassen Vanelsloo also asserts that this court should vacate the firearm enhancements, because the State failed to show that he was armed with a firearm.

Whether a person is armed is a mixed question of law and fact. State v. Schelin, 147 Wn.2d 562, 565-66, 55 P.3d 632 (2002). When the court determines whether the facts are sufficient as a matter of law to prove that the defendant was armed, it is a question of law reviewed de novo. Id. at 566.

A person is armed for the purposes of a sentencing enhancement if the weapon is easily accessible and readily available for offensive or defensive purposes during the time of the crime. State v. Brown, 162 Wn.2d 422, 431, 173 P.3d 245 (2007); State v. O'Neal, 159 Wn.2d 500, 503-04, 150 P.3d 1121 (2007). But, a person is not armed simply because he or she owns or possesses a weapon. State v. Eckenrode, 159 Wn.2d 488, 493, 150 P.3d 1116 (2007). Instead, there must be a nexus between the defendant, the weapon, and the crime. Id. In examining this nexus, courts look at the nature of the crime, the type of weapon, and the circumstances under which it is found, such was whether it was out in the open, in a locked container, or in a closet. State v. Ague-Masters, 138 Wn. App. 86, 104, 156 P.3d 265 (2007).

Sassen Vanelsloo argues that the shotgun was too far away from him to qualify as easily accessible and readily available. The shotgun was found in the rear cargo area of the Kia, which was behind the backseat area. For Sassen

gunshots, or muzzle flashes can help prove operability when the gun itself is not offered into evidence. 155 Wn. App. at 714 n.11. Here, the shotgun was offered into evidence.

Vanelsloo to reach the shotgun, he would have had to exit the car or move into the backseat.

Sassen Vanelsloo compares this case to State v. Gurske, 155 Wn.2d 134, 118 P.3d 333 (2005) and State v. Mills, 80 Wn. App. 231, 907 P.2d 316 (1995). Gurske was arrested after a traffic stop, and police officers conducted an inventory search of his truck. Gurske, 155 Wn.2d at 136. In the backseat of the truck was a backpack. Id. The backpack contained an unloaded pistol, a fully loaded magazine, and three grams of methamphetamine. Id. The trial court imposed a deadly weapon enhancement. Id. at 136-37. On appeal, the Supreme Court held that there was insufficient evidence to show that the pistol was easily accessible and readily available for offensive or defensive use. Id. at 143. The court reasoned that to meet this test, the weapon must be easy to access for use against another person, and it may be used to facilitate the commission of a crime, escape, protect contraband, or prevent police investigation. Id. at 139. But, the facts of that case did not indicate whether the gun was within Gurske's reach. Id. at 143. Gurske would have had to unzip the backpack and remove other objects to access the pistol. Id. And, there were no facts to suggest that Gurske had used the pistol or had access to it at another time. Id.

In Mills, the defendant was arrested and put in a patrol car. 80 Wn. App. at 233. The officer noticed Mills's furtive movements in the patrol car and discovered a motel key in the seat cushions. Id. A search of the motel room revealed methamphetamine and a pistol. Id. The Court of Appeals held that these facts constituted insufficient evidence that Mills was armed. Id. at 234, 237. There was

11

no evidence that Mills, the gun, and the drugs were all in the hotel room together on the date charged as the date of the crime. Id. at 234. Instead, Mills would have had to travel several miles to retrieve the gun. Id. at 237.

But, the Washington Supreme Court has applied the nexus analysis to find that sufficient evidence supported firearm enhancements where the defendants were not armed at the time of arrest. See O'Neal, 159 Wn.2d at 504-05, 507; Eckenrode, 159 Wn.2d at 492, 496. Police officers arrived at Eckenrode's home after he called 911 saying that there was an intruder in his home and he was armed and ready to shoot. Eckenrode, 159 Wn.2d at 491. The police swept his house and found drugs, a rifle, and a pistol. Id. at 491-92. A search warrant revealed signs of a marijuana grow operation in the house. Id. The rifle was loaded. Id. at 494. Eckenrode had a police scanner which he could use to protect against police investigation. Id. Evidence of the drug manufacturing operation pervaded the house. Id. Officers arrested Eckenrode in his front yard, far from the weapons in his home. Id. at 492. But, the Supreme Court nonetheless held that there was sufficient evidence of a connection between Eckenrode, the guns, and the drug manufacturing operation. Id. at 494. From this evidence, the jury could have found that the weapons were present to protect the ongoing criminal enterprise.[3] Id.

Similarly, in O'Neal, none of the defendants were holding weapons when they were arrested. 159 Wn.2d at 502. But, a search of their mobile home

---

[3] In reaching this conclusion, the Supreme Court distinguished Gurske, because in that case the State never tried to prove that the weapon was readily accessible at a relevant time or that there was a connection between the weapon and the crime. Eckenrode, 159 Wn.2d at 494-95. Instead, the State proved only possession, which was not enough. Id.

revealed extensive evidence of drug use and manufacturing, over 20 guns, body armor, a police scanner, and night vision goggles. Id. at 503. The Supreme Court held that there was sufficient evidence for the jury to find that the deadly weapons were easily accessible and readily available to the defendants, and that there was a nexus between the weapons, the crimes, and the defendants. Id. at 507. The court reasoned that the defendant need not be armed at the moment of arrest to be armed for purposes of a firearm enhancement. Id. at 504. Where an AR-15 was found leaning against a wall and a pistol under a mattress, the State's theory that the weapons were easily accessible and readily available to protect the continuing criminal enterprise was appropriate. Id. at 504-05.

We further note that firearm enhancements have been upheld on unlawful possession offenses, not merely drug manufacturing or delivery crimes. See, e.g., State v. Easterlin, 159 Wn.2d 203, 207, 210, 149 P.3d 366 (2006). In Easterlin, the defendant was found asleep in a car with a gun on his lap and cocaine in his sock. Id. at 207. The court held that these facts constituted sufficient evidence that Easterlin was armed to protect the drugs. Id. at 210. It noted that, "[s]o long as the facts and circumstances support an inference of a connection between the weapon, the crime, and the defendant, sufficient evidence exists" to support a finding that the defendant was armed. Id. The court affirmed the firearm enhancement on Easterlin's conviction for unlawful possession of cocaine. Id. at 206-07, 210.

In this case, the State's theory was that Sassen Vanelsloo was conducting an ongoing criminal operation. Aardema testified that both she and Sassen

13

Vanelsloo were dealing drugs at that time, usually methamphetamine and heroin. A shotgun found in the rear cargo area was admitted into evidence. Officer Leake testified that its grip was facing at an angle toward the passenger compartment of the car, so someone entering the car could easily grab the gun. The backpack was admitted. Officer Leake testified that the backpack was found just a foot away from the barrel of the shotgun. Officers testified that within this backpack, they found a locked bank bag. This bank bag was unlocked with keys found in the center console of the car. The bank bag contained pills suspected to be controlled substances. The bank bag also contained substances suspected to be heroin and methamphetamine.[4] It contained a digital scale, an item often used in the sale of controlled substances. There was a packet of small glassine envelopes in the bag as well. And, a pouch in the bank bag contained multiple small plastic baggies. There were seven cell phones in the car. There were two prepaid phone cards in the center console.

Additionally, there was evidence that connected Sassen Vanelsloo to the drug operation in the Kia. Aardema testified that Sassen Vanelsloo was driving the Kia on September 7, 2012. The officers found a locked safe on the floorboard behind the driver's seat of the vehicle. The safe contained a box containing a roll of $1 bills, totaling $20. It also contained a vehicle title for a 1990 Lincoln Town Car. And, a revolver and a small semiautomatic handgun were found in the safe.[5]

---

[4] Later tests of these pills and substances confirmed that they were clonazepam, alprazolam, methamphetamine, and heroin.

[5] The State specified that the firearm enhancement was based solely on the shotgun, which was easily accessible and readily available, while the guns found in the safe were not.

14

Aardema testified that this safe belonged to Sassen Vanelsloo, and he took it everywhere with him. The backpack contained several receipts with Sassen Vanelsloo's name on them. Sassen Vanelsloo's DNA was found on the shotgun. When Officer Leake came into contact with Sassen Vanelsloo again on December 11, 2012, Sassen Vanelsloo was driving the Lincoln Town Car to which the title belonged. And, Officer Leake spoke with him about the pursuit of the Kia on September 7, 2012. Officer Leake stated that Sassen Vanelsloo responded, " 'Oh, yeah, I heard it was a 19-year old guy, but you and I know who was driving.' "

We conclude that there was sufficient evidence to demonstrate that the shotgun was easily accessible and readily available, and that there was a nexus between Sassen Vanelsloo, the shotgun, and the drugs. The State charged the firearm enhancements on only the unlawful possession and possession with intent to deliver offenses, not the attempting to elude a police officer offense. The State also based the firearm enhancements solely on the shotgun found in the rear cargo hatch, not the two other firearms found in the locked safe. Under O'Neal, the State does not have to prove that the firearm was easily accessible and readily available at a specific time and place. 159 Wn.2d at 504-05. It is enough that the State establishes the weapon was easily accessible and readily available at the time of the crime. Id. Here, the backpack was the sole source of the drug charges. It was in close proximity to the shotgun. When Sassen Vanelsloo was near or in possession of the drugs, he was necessarily near and in possession of the firearm. The shotgun had a shell in the magazine and could have been easily chambered and fired against another person.

Additionally, from Aardema's testimony, the numerous cell phones, digital scale, glassine envelopes, and the small baggies, a reasonable person could have concluded that Sassen Vanelsloo was selling drugs out of the Kia. Unlike the firearms found in the locked safe, the shotgun was found just one foot away from the backpack containing the controlled substances. When Sassen Vanelsloo sold the drugs, the shotgun would have been easily accessible and readily available for him to protect the ongoing criminal enterprise. We affirm the firearm enhancements.

## IV. Legal Financial Obligations

Sassen Vanelsloo argues that the trial court failed to consider his ability to pay before imposing discretionary legal financial obligations (LFOs). Sassen Vanelsloo also asserts that his trial counsel provided ineffective assistance by failing to object to the imposition of discretionary LFOs.

The trial court imposed mandatory and discretionary LFOs. The record does not show that the trial court inquired into Sassen Vanelsloo's current and future ability to pay before it imposed any LFOs.

Under RCW 10.01.160(3), trial courts must conduct an individualized inquiry on the record about a defendant's current and future ability to pay before imposing LFOs. State v. Blazina, 182 Wn.2d 827, 838-39, 344 P.3d 680 (2015). The Blazina court reached this issue, even though the appellants did not object to the imposition of discretionary LFOs at sentencing. Id. at 831-32, 834-35. It did so because RAP 2.5(a) permits the appellate courts to exercise discretion to accept review of claimed errors not appealed as a matter of right. Id. at 834-35.

The need for reform of the LFO systems demanded that the court exercise its discretion to do so. Id.

Here, the record does not show that Sassen Vanelsloo objected to the imposition of discretionary LFOs. However, the State agrees that remand is proper. Because the State concedes that it would be appropriate to remand this case for the trial court to reconsider the LFOs, we exercise our discretion to address this issue. And, because the record does not contain an individualized inquiry into Sassen Vanelsloo's current or future ability to pay discretionary LFOs, we remand for the trial court to perform such an inquiry.[6]

V.    Substantial Evidence to Support Convictions

In a statement of additional grounds, Sassen Vanelsloo makes a number of arguments. First, he argues that he is actually innocent of the crimes of which he was convicted. We review this argument as a challenge to the sufficiency of the evidence.

Sassen Vanelsloo contends that several weaknesses in the State's case prove his innocence. He points to the testimony of Cheri Mulligan, the defense investigator. Mulligan testified about her interview of Nathaniel Huckaby. Huckaby told her that he was the one who was driving the car that was involved in the police chase on September 7, 2012. And, Sassen Vanelsloo points to the testimony of

---

[6] As a result, we decline to reach Sassen Vanelsloo's ineffective assistance of counsel claim. Any prejudice that resulted as a result of counsel's failure to object to the imposition of LFOs will be cured by an inquiry into Sassen Vanelsloo's ability to pay.

his alibi witness, Burton. Burton testified that Sassen Vanelsloo was at her house on September 7, 2012.

This evidence does not conclusively demonstrate that Sassen Vanelsloo was not the driver of the Kia. Instead, this evidence required the jury to decide which version of events to believe. Credibility determinations are for the trier of fact. State v. Camarillo, 115 Wn.2d 60, 71, 794 P.2d 850 (1990). This court does not disturb them on appeal. Id. We hold that sufficient evidence supports Sassen Vanelsloo's convictions.

## VI. Prosecutorial Misconduct

Sassen Vanelsloo further contends that the State committed prosecutorial misconduct by (1) vouching for a witness's credibility, (2) offering false testimony, and (3) failing to disclose Brady[7] material.

To succeed on a claim of prosecutorial misconduct, a defendant must show that the prosecutor's conduct was improper and prejudicial in light of the entire record and the circumstances at trial. State v. Thorgerson, 172 Wn.2d 438, 442, 258 P.3d 43 (2011). The failure to object to an improper remark waives any error, unless the remark is so flagrant and ill-intentioned that the resulting prejudice could not have been cured by an admonition to the jury. Id. at 443.

The prosecutor improperly vouches for a witness by expressing a personal belief in the truthfulness of the witness or indicating that evidence not presented at trial supports the witness's testimony. Id. Sassen Vanelsloo argues that the prosecutor improperly vouched for Aardema during opening statement by saying,

---

[7] Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

"You will hear that Ms. Aardema has previously been convicted of a crime and she is facing charges at the present. You will be advised that she has been offered a resolution of those charges in exchange for testifying truthfully before this Court." But, the State is permitted to address the expected evidence during opening statement. Id. at 444. Rather than guarantee that Aardema's testimony will be truthful, this statement previewed the evidence that would come before the jury. Namely, that Aardema was testifying in accordance with a plea deal. The prosecutor did not commit misconduct in doing so.

The State has a duty not to elicit perjury or present false evidence. State v. Finnegan, 6 Wn. App. 612, 616, 495 P.2d 674 (1972). If State witnesses testify falsely, the prosecutor must correct them. Id. To succeed on a claim that the prosecutor presented false evidence, Sassen Vanelsloo must show (1) the testimony was actually false, (2) the prosecutor knew or should have known that the testimony was actually false, and (3) the false testimony was material. See United States v. Zuno-Arce, 339 F.3d 886, 889 (9th Cir. 2003).

Sassen Vanelsloo argues that the prosecutor knew or should have known that Aardema and Officer Leake testified falsely. He contends this is so, because Officer Leake claimed to have identified the driver yet failed to communicate this description to his fellow officers via dispatch, did not include Sassen Vanelsloo's description in the police report, and was contradicted by Officer Vodopich. And, he argues that the prosecutor knew Aardema was testifying falsely, because she was biased as a result of the plea agreement.

19

But, Sassen Vanelsloo has alleged only that Aardema's bias and Officer Leake's contradictions demonstrate that their testimony was false. Conflicting testimony is not evidence of falsity, but rather a matter of credibility for the jury to resolve. See Camarillo, 115 Wn.2d at 71. The prosecutor informed the jury of Aardema's plea deal and acknowledged the arguable mistakes made by the police officers in this case. Therefore, the record does not support Sassen Vanelsloo's allegations that the prosecutor relied on false testimony.

Under Brady v. Maryland, the prosecutor violates due process by suppressing favorable evidence where the evidence is material to guilt or punishment. 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). To establish a Brady violation, the defendant must show: (1) the evidence is favorable to him or her, because it is either exculpatory or impeaching, (2) the evidence was willfully or inadvertently suppressed by the State, and (3) the evidence is material. State v. Davila, 184 Wn.2d 55, 69, 357 P.3d 636 (2015).

However, Sassen Vanelsloo has not produced evidence that the State willfully or inadvertently suppressed any favorable evidence to him. He alleges that the State was aware that Aardema wanted Andrea Kohler to lie on the stand, and that it suppressed this evidence by opting not to call Kohler. But, Sassen Vanelsloo provided a memorandum from the defense investigator to defense counsel dated June 13, 2014—over a month before trial began. This document reveals that the defense team had been contacted by Kohler, who informed them that Aardema wanted her to lie to the police. Sassen Vanelsloo also alleges that the State did not disclose that Huckaby admitted to being the driver. But, the

defense interviewed Huckaby, and the defense investigator testified as to this conversation at trial. Thus, the record does not support Sassen Vanelsloo's claims of a Brady violation. We conclude that Sassen Vanelsloo has not established that the prosecutor committed misconduct.

VII.   Admitted Letters and Phone Calls

Sassen Vanelsloo also asserts that the trial court erred by admitting pieces of letters and phone calls, in violation of the rule of completeness. After several lengthy conversations, the court decided to admit two portions of phone calls Sassen Vanelsloo made in jail. And, the court admitted a number of letters Sassen Vanelsloo wrote to Aardema while he was in jail.

Sassen Vanelsloo has the burden of providing an adequate record to establish error. State v. Siouvanh, 175 Wn.2d 607, 619, 290 P.3d 942 (2012); RAP 9.2(b). This court may decline to address a claimed error when faced with a material omission in the record. State v. Ward, 138 Wn.2d 460, 465, 979 P.2d 850 (1999). The letters and phone calls Sassen Vanelsloo challenges were not made part of the record on appeal. As such, we decline to consider this issue.

VIII.   Cumulative Error

Sassen Vanelsloo further argues that the doctrine of cumulative error warrants reversal. He alleges that the trial court erred in imposing the firearm enhancements when the State did not prove that he physically held the firearm on the day of the incident. And, he contends that the trial court erred in not suppressing Officer Leake's and Aardema's testimony considering the inconsistencies in their stories.

21

The cumulative error doctrine applies only in circumstances where there were several trial errors that standing alone may not be sufficient to justify reversal, but viewed together may deny the defendant a fair trial. State v. Greiff, 141 Wn.2d 910, 929, 10 P.3d 390 (2000). As discussed above, sufficient evidence supports the firearm enhancements in this case. And, the fact that Officer Leake and Aardema contradicted each other is not a trial error. This was a matter of credibility for the jury to weigh. See Camarillo, 115 Wn.2d at 71. Sassen Vanelsloo has not alleged any errors that combined to deny him a fair trial.

IX.   Appellate Costs

Sassen Vanelsloo asks this court not to impose costs of appeal. He cites State v. Sinclair, 192 Wn. App. 380, 367 P.3d 612 (2016). In that case, the trial court made findings in support of an order of indigency. 192 Wn. App. at 393. The Court of Appeals presumed that where there was no trial court order finding that his financial condition had improved or was likely to improve, Sinclair remained indigent. Id. As a result, the court exercised its discretion to rule that an award of appellate costs to the State was improper. Id.

Here, Sassen Vanelsloo filed a motion and affidavit for order of indigency. The court granted this motion, finding that Sassen Vanelsloo was unable by reason of poverty to pay any of the expenses of appellate review. As a result, the court appointed appellate counsel and ordered preparation of the record at public expense. The State has not presented any evidence that Sassen Vanelsloo's financial condition has changed since this order was entered. We presume that

22

Sassen Vanelsloo remains indigent and decline to award appellate costs to the State.

We affirm the convictions and remand for reconsideration of Sassen Vanelsloo's ability to pay LFOs.

WE CONCUR: