# RECZNIK *v.* CITY OF LORAIN.

No. 323.   Decided November 18, 1968.

*Meyer Gordon* for petitioner.
*Henry T. Webber* for respondent.

Per Curiam.

On the night of June 10, 1965, two police officers of the City of Lorain, Ohio, left their assigned cruising district and drove to the premises at 1420–1422 Broadway because they "suspected a crime was being committed" there. This suspicion was founded upon tips from persons who had stopped the officers on the street. Petitioner is the owner of the building at 1420–1422 Broadway, which contains two unconnected units. No. 1420 consists of the ground floor and basement and houses a cigar shop and storeroom. No. 1422 is a second story suite of rooms. When the officers arrived at the premises at approximately 1 a. m., they noticed an unusually large number of cars parked in the vicinity. According to their testimony they met the petitioner outside the rear entrance to the upstairs suite, warned him that there had better be nothing illegal going on inside, and said they would return in half an hour.

When they did return 20 minutes later, a large number of cars were still parked near the building, and the officers observed several men entering the upstairs apartment. The officers then climbed the stairs, listened to the sound of voices within, and tried to look through the window and door. Unable to see inside, they walked through the back doorway unannounced. As they headed for the front of the apartment, the petitioner emerged from a front room and told the officers they could not enter. Through the door opened by the petitioner, one of the officers saw a dice game in progress. The officers entered the room, placed everyone present under arrest, and seized the table, chips, dice, and money which were being used in the game. Those arrested, including the petitioner, were taken to the police station. The police continued to search the apartment, and came across some keys which they thought might open the store and basement downstairs. Apparently because the

officers "had information that there were all sorts of gaming devices downstairs," the store and basement were also searched thoroughly, and various numbers game paraphernalia were discovered and seized.

Petitioner was convicted in the Municipal Court of Lorain of violating three ordinances which prohibit keeping a gambling place, exhibiting a gambling device, and possessing a numbers game. His motion to suppress all the evidence which had been seized at 1420–1422 Broadway was denied, the court ruling, upon the evidence above summarized, that the officers had "entered this public establishment and observed gambling being conducted openly and in full view." On appeal to the Court of Common Pleas, the conviction for possession of the numbers game paraphernalia found in the lower unit of the building was reversed. The court held that since the petitioner had already been taken to the police station and booked, "the search of the storeroom in this case was too remote in time to have been incidental to the arrest." The Court of Appeals affirmed the convictions on the two remaining counts, and the Supreme Court of Ohio dismissed an appeal. Since we have concluded that the petitioner's rights under the Fourth and Fourteenth Amendments to the Constitution were infringed by the entry of the police onto his premises, we grant certiorari and reverse. *Mapp* v. *Ohio,* 367 U. S. 643.

The finding of the Municipal Court that the petitioner's apartment was a "public establishment" has no support in the record. While the cigar store was usually open to the public during business hours, it was closed and dark at the time of the arrest. The upstairs suite was an entirely separate unit, with a different address and different entrances. The respondent's suggestion that the officers were privileged to enter because the apartment "at that point had taken on, from the amount of people, a public appearance," is untenable. The congregation of

a large number of persons in a private home does not transform it into a public place open to the police.

Respondent argues that the entry into the apartment was justified as incidental to the arrest of the petitioner, who the officers had probable cause to believe was conducting an illegal game. The senior arresting officer, however, did not so view the matter, for he conceded that when he entered the apartment, he "had no evidence to make an arrest." Nevertheless, it is argued, the officers could have entered to arrest the petitioner in view of the tips received from informers that evening and their own corroborating observations of the activities at the apartment. We cannot agree that the knowledge of the officers revealed by this record amounted to probable cause to believe that a crime was being committed. The testimony of one officer that the building was a "noted gambling joint" was stricken by the trial judge, and no further effort was made to show that either the petitioner or the apartment was at that time connected with illicit gambling operations. Nor did the respondent even attempt to establish that the informers were reliable. The officers identified these informers only as "people on the street" who were previously unknown to the officers and whose names they did not bother to ask because "there was no reason for it." They did not relate what information they received from these nameless individuals other than that there were "all sorts of gaming devices *downstairs*." (Emphasis supplied.)

We have held that the prosecution has not met its burden when an arresting officer "said no more than that someone (he did not say who) had told him something (he did not say what) about the petitioner." *Beck* v. *Ohio,* 379 U. S. 89, 97. Even where a search warrant is obtained, the police must show a basis for the search beyond the mere fact of an assertion by an informer. *Aguilar* v. *Texas,* 378 U. S. 108. At least as much is

required to support a search without a warrant. *Beck* v. *Ohio, supra,* at 96. Since the respondent did not meet the burden of showing probable cause in this case, the motion to suppress should have been granted.

The conviction is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

MR. JUSTICE STEWART and MR. JUSTICE WHITE would deny the petition for certiorari.

MR. JUSTICE BLACK, whom MR. JUSTICE HARLAN joins, dissenting.

The Court here summarily reverses the jury's conviction of petitioner, Pete Recznik, for violating the city's laws against keeping a gambling house and having possession of gambling tables and other gambling devices. The Court simply grants certiorari and reverses, giving the City of Lorain no opportunity at all to argue its case before us. I dissent from such a hasty, ill-considered reversal. To reverse the conviction, this Court holds that it was error for the trial court to deny Recznik's motion to suppress evidence obtained in part by a search without a warrant of the gambling establishment. Having read the entire 388 pages of testimony, I think that they show beyond doubt that there was no unlawful search and seizure and I think that an argument would reveal that fact to this Court. This is made clear by the *per curiam* opinion's reliance on an order of July 7, 1965, refusing, prior to trial, to suppress the evidence. This Court bases its reversal on its disagreement with the pretrial finding that petitioner's gambling house was a "public establishment." The Court states that this finding "has no support in the record." While I think that the testimony contains far more than enough evidence to support a finding that the so-called "apart-

ment" was maintained as a public gambling house, and not as a private residence, it happens that this was only an alternative ground for the trial court's refusal to suppress at this pretrial hearing. The other ground was this:

"The Court upon consideration overrules defendant's motion for the following reasons, to wit: That no evidence of any illegal search or seizure was presented. Defendant merely presented oral and written arguments in support of his motion."

The fact that no sworn evidence was presented to support the motion to suppress was, of course, sufficient to dispose of the pretrial motion as the court did. That this first pretrial motion is not now relied on by petitioner is shown by his statement to the court at the beginning of the trial to this effect:

"Mr. Gordon: On the motion to suppress the evidence in this case, the Court is to consider the evidence in the main case that will be presented to the Jury at this time and make its decision later."

At the end of the city's evidence the motion to suppress was made again and denied; it was again made and denied at the conclusion of all the evidence. So it is not to the first pretrial motion to suppress of July 7, 1965, that we must look but to the whole record. That record, in my judgment, shows that the petitioner, who owned the premises which he permitted to be used as a gambling establishment, not only did not object to the officers going into the building but also actually invited them.

As the Court says, the building into which the officers entered belongs to the petitioner, Pete Recznik. He is evidently a well-known gambler around town since he testified that he had been in and out of jail for around a quarter of a century, as had John Micjan whom the

petitioner asserted was his upstairs "tenant" in the private "apartment" which was filled with dice, game tables, and other gambling devices. In fact, Micjan had come to the "apartment" straight from the jail only a month or two before.

The arrest took place in the following factual context. While Police Officer Kochan was cruising around the streets someone told him that gambling was going on at Recznik's building. He and his partner decided to go up and look around in the area of the building. Now, of course, this street information they had received would not alone have been enough to give probable cause either for a search warrant or an arrest. Nor did the officers treat it as enough. It was enough, however, for the officers to investigate, which they did. They went to the building about midnight and saw signs of extraordinary activities around it. While the bottom floor was dark, the upstairs, where the gambling paraphernalia were located, was well lighted. They saw about 40 to 50 automobiles parked in the front and rear of the building. They observed men coming in cars, getting out, going up the back stairs, and entering the upstairs rooms without any difficulty whatever. They observed someone upstairs peeping at them through venetian blinds and shortly thereafter petitioner Recznik came out and talked with them. Recznik did not then or at any time order the officers not to come up. Instead, according to petitioner Recznik's own testimony, he told Officer Kochan that they were having a party upstairs and, addressing the officer directly, said: "If you want to come up you can come up." Again, Recznik testified: "I told him the first time, we had a party, that he was invited up. He says, 'I will be back later.'"

After these invitations the officers went away and came back about 1 a. m., finding the place still lighted and filled with people. The officers walked up the

back steps, where they had seen the others walking in and out. They opened the door which they testified was unlocked. They saw many people there. Recznik testified that they pulled the screen door off its hinges. The officers denied it and obviously neither the jury that convicted nor the judge that refused to suppress the evidence believed Recznik. Once inside, the officers met Recznik. Recznik testified as follows in response to questions from the prosecuting attorney:

"Q. There has been a lot of talk about a warrant. Did you ask him to see a warrant?
"A. No, I didn't say nothing.
"Q. Did you tell him to stay out?
"A. No. Absolutely not.
"Q. Did you say, 'You can't come in here?'
"A. No.
"Q. You just said, 'What do you want?'
"A. I said, 'What do you want.'

.        .        .        .        .

"Q. Did you tell him 'You can't search this place?'
"A. Absolutely not. Why would I tell him that?"

.        .        .        .        .

Officer Kochan testified that he saw dice and other gambling devices and that when Recznik opened the door to another room he, Kochan, looked over Recznik's shoulder and saw many people gambling on a large dice table upon which was money and a green table covering. Micjan explained the presence of the money and dice table in this illuminating way: The money, $213, he had found on the street in a purse; the large dice table had been brought to him by strangers and left in his "apartment." The moment Kochan (who had been invited by Recznik to come to the "party") saw all these gambling paraphernalia, saw the people with money in their hands crying out in gambler's language "I fade you,"

he stated that all there were under arrest. That was his duty. Ohio law provides that an officer seeing a person committing a misdemeanor has a duty to arrest. Since the arrest was legal, the officer then had the authority to search the remainder of the building without a warrant. This he did. And when the case got to the jury it promptly convicted.

There is no case decided by this Court that calls for a reversal here on the ground that the officer lacked probable cause to arrest for the misdemeanors he actually saw committed. One who will take the time to read this entire record as I have will find, I think, that this gambling establishment was so notorious in Lorain that it is not at all surprising that strangers to the police were urging them to do something about it. I wonder if in addition to having its just conviction reversed the City of Lorain will be compelled to return to their guilty owners the dice, dice tables, and other gambling devices that the officers took away as contraband. I regret very much that this Court, by its hasty, summary reversal, is providing its critics with such choice ammunition for their attacks.

I would deny certiorari. If, however, four members of the Court are determined to grant certiorari, I would set the case down for argument in the conventional fashion and the normal way.