[No. 47130-4. En Banc. July 30, 1981.]

THE STATE OF WASHINGTON, *Respondent,* v. SUZZI SEAGULL, ET AL, *Petitioners.*

*Niichel, Rutz & Johnson,* by *David V. Johnson,* for petitioners.

*Grant S. Meiner, Prosecuting Attorney,* and *Kenneth L. Cowsert, Deputy,* for respondent.

STAFFORD, J.—Petitioners seek review of a denial of their motion to suppress evidence gathered as a result of an allegedly unconstitutional search and seizure. We affirm.

In the summer of 1977 petitioners Suzzi Seagull and Douglas Gilson lived in an old farmhouse in rural Clallam County. Approximately 20 feet to the west of the house were a chicken coop/pumphouse and a greenhouse. The 10-by 12-foot greenhouse was constructed of two-by-fours covered with light translucent plastic. Between the house and the outbuildings was patchy grass, and, apparently, a worn-down area somewhat adjacent to the house resulting

from foot traffic between the north and south doors.

On July 8, 1977, Sergeant Talvi of the Clallam County Sheriff Department was canvassing the neighborhood for information about an abandoned vehicle with a broken window and bloodstains. Petitioners' residence, located less than a mile from the vehicle, was the third house visited.

Talvi stopped in a parking area to the south of the house. He went to the south door (originally the back door, but now used as the main entrance by the occupants), knocked and received no answer. At that time he remembered having been there over a year previously and having been told by the former occupants that they could not hear knocking on that door. It was separated from the rest of the house by a small entrance room and another door, which was closed at the time. Consequently, he proceeded toward the north door by walking through the west yard. He did not take the most direct route along the side of the house. Rather, he walked down the middle of the open space, traversing the patchy grass area, which took him somewhat closer to the outbuildings. By the time he reached the area between the corner of the house and the greenhouse he decided that apparently no one was home. He stopped between six and ten feet from the greenhouse and observed what he concluded was a marijuana plant growing in the southeast corner. The plant was visible through a longitudinal 2–inch strip where condensation had not collected on the plastic. He looked no further and took no further action, but turned around and immediately left the premises.

The next day Talvi obtained a search warrant for the house and outbuildings, which was ultimately executed by another officer. Marijuana and paraphernalia were seized in the house and 60 plants were taken from the northwest corner of the greenhouse, yielding over one–half pound of marijuana.

At the suppression hearing, Talvi apparently learned for the first time that the plant in the southeast corner which he had identified as marijuana was in actuality a tomato plant. While marijuana plants were in fact being grown in

the greenhouse, none could have been seen from the point of his observation. The marijuana plants were located only in the northwest corner of the greenhouse.

The trial court denied the motion to suppress and found petitioners guilty of possession of over 40 grams of marijuana. RCW 69.50.401. The Court of Appeals affirmed, holding Sergeant Talvi had an implied invitation to enter the property and that he had not exceeded that implied invitation by making his observation of the plant in the greenhouse. The court also held the officer's innocent mistake of identifying a tomato plant as marijuana did not invalidate the warrant.

Two issues are presented: (1) whether the police officer had a right to be where he was when he observed the plants in the greenhouse; and (2) whether what was found as a result of the search invalidated the warrant.

■ The mere observation of that which is there to be seen does not necessarily constitute a search within the meaning of the Fourth Amendment. *State v. Glasper,* 84 Wn.2d 17, 20, 523 P.2d 937 (1974); *State v. Martin,* 73 Wn.2d 616, 440 P.2d 429 (1968); *Recznik v. Lorain,* 393 U.S. 166, 21 L. Ed. 2d 317, 89 S. Ct. 342 (1968). As stated in 1 W. LaFave, *Search and Seizure* § 2.2, at 240 (1978) (hereinafter LaFave):

> As a general proposition, it is fair to say that when a law enforcement officer is able to detect something by utilization of one or more of his senses while lawfully present at the vantage point where those senses are used, that detection does not constitute a "search" within the meaning of the Fourth Amendment.

This "open view doctrine" is to be distinguished from the visually similar, but legally distinct, "plain view doctrine". As noted in *State v. Kaaheena,* 59 Hawaii 23, 28–29, 575 P.2d 462, 466–67 (1978):

> In the "plain view" situation "the view takes place *after* an intrusion into activities or areas as to which there is a reasonable expectation of privacy." The officer has already intruded, and, if his intrusion is justified, the objects in plain view, sighted inadvertently, will be

admissible. *Coolidge v. New Hampshire,* 403 U.S. 443 [29 L. Ed. 2d 564, 91 S. Ct. 2022] (1971); *Harris v. United States,* 390 U.S. 234 [19 L. Ed. 2d 1067, 88 S. Ct. 992] (1968).

In the "open view" situation, however, the observation takes place from a non–intrusive vantage point. The governmental agent is either on the outside looking outside or on the outside looking inside to that which is knowingly exposed to the public. *See* Moylan, *The Plain View Doctrine: Unexpected Child of the Great "Search Incident" Geography Battle,* 26 Mercer L. Rev. 1047, 1096, 1097 (1975). The object under observation is not subject to any reasonable expectation of privacy and the observation is not within the scope of the constitution.

(Some citations and footnote omitted.) *See also* 68 Am. Jur. 2d *Searches and Seizures* §§ 23, 88 (1973); LaFave § 2.2.

Thus, the question here is whether the officer, by his actions, intruded upon a privacy expectation deserving of Fourth Amendment protection under *Katz v. United States,* 389 U.S. 347, 19 L. Ed. 2d 576, 88 S. Ct. 507 (1967). If his vantage point was not within such a constitutionally protected area, his observation of the greenhouse was permissible under the open view doctrine.

■ The presence of an officer within the curtilage of a residence does not automatically amount to an unconstitutional invasion of privacy. Rather, it must be determined under the facts of each case just how private the particular observation point actually was. It is clear that police with legitimate business[1] may enter areas of the curtilage which are impliedly open, such as access routes to the house. In so doing they are free to keep their eyes open. *See generally* LaFave, at § 2.3. An officer is permitted the same license to intrude as a reasonably respectful citizen. *United States v. Vilhotti,* 323 F. Supp. 425 (S.D.N.Y.), *aff'd in part and rev'd in part,* 452 F.2d 1186 (2d Cir. 1971), *cert. denied,* 406

---

[1]It is undisputed, and the trial court found, Sergeant Talvi entered upon the premises in pursuit of a legitimate police investigation or inquiry. His purpose was to question the occupants about the abandoned vehicle and its occupants. This he had a right to do. *Davis v. United States,* 327 F.2d 301 (9th Cir. 1964).

U.S. 947, 32 L. Ed. 2d 335, 92 S. Ct. 2051 (1972). However, a substantial and unreasonable departure from such an area, or a particularly intrusive method of viewing, will exceed the scope of the implied invitation and intrude upon a constitutionally protected expectation of privacy.

What is reasonable cannot be determined by a fixed formula. It must be based on the facts and circumstances of each case. *Ker v. California,* 374 U.S. 23, 33, 10 L. Ed. 2d 726, 83 S. Ct. 1623 (1963). Thus, it is instructive to review comparable cases from other jurisdictions to determine what has been considered reasonable police behavior. Such a review makes it clear that substantially more intrusive police conduct than that which occurred here has been held constitutionally permissible.[2] Further, in those comparable cases wherein the evidence was ultimately suppressed, police conduct was substantially more intrusive than that in the instant case.[3]

---

[2]*See, e.g., United States v. Wright,* 449 F.2d 1355 (D.C. Cir. 1971), *cert. denied,* 405 U.S. 947, 30 L. Ed. 2d 817, 92 S. Ct. 986 (1972) (officer on his knees using a flashlight looked into garage abutting street through an 8- to 9-inch gap between door and frame); *People v. Bradley,* 1 Cal. 3d 80, 460 P.2d 129, 81 Cal. Rptr. 457 (1969) (police investigating informant's tip went into fenced-in backyard at night); *People v. Superior Court,* 33 Cal. App. 3d 475, 109 Cal. Rptr. 106 (1973) (while approaching house to arrest suspect officers looked through cracks in the door of an attached garage for no particular reason, and saw contraband); *People v. Willard,* 238 Cal. App. 2d 292, 47 Cal. Rptr. 734 (1965) (officers secretly on back porch looked through bathroom window); *People v. Steffano,* 177 Cal. App. 2d 414, 2 Cal. Rptr. 176 (1960) (officer secretly looked in window of rear door which had drawn shade which was worn and frayed); *McDougall v. State,* 316 So. 2d 624 (Fla. Dist. Ct. App. 1975) (officer stood on box to look in window, shone flashlight into room); *State v. Brighter,* 60 Hawaii 318, 589 P.2d 527 (1979) (officer went to shade tree in backyard to rest, saw marijuana patch not then visible from public areas); *State v. Crea,* 305 Minn. 342, 233 N.W.2d 736 (1975) (one officer shone flashlight through basement window, while another peered through small hole in cloth covering a garage window); *State v. Gott,* 456 S.W.2d 38 (Mo. 1970) (officers were at residence looking for suspect on informant's tip); *Bies v. State,* 76 Wis. 2d 457, 251 N.W.2d 461 (1977) (officers went around garage on private property attempting to see in, using flashlight). It should be noted that these cases are cited for illustrative purposes only. We do not necessarily agree with the results reached in all cases.

[3]*See, e.g., Texas v. Gonzales,* 388 F.2d 145 (5th Cir. 1968) (officers on a "fishing expedition" repeatedly peered into windows all around the residence, and one

This case is factually similar to *United States v. Anderson,* 552 F.2d 1296 (8th Cir. 1977). There, police officers went to the front door of a suspect's residence to talk with him. After ringing the doorbell and receiving no answer, they heard a dog barking and saw a light in the backyard. While walking around the house to see if someone was with the dog they looked into a basement window, saw incriminating evidence, and obtained a warrant based on that observation. The court refused to suppress the evidence as having been the fruit of an illegal search. Defendants argued that the officers went to the back of the house on a "pretext", but the trial court found otherwise and its determination was held not to be clearly erroneous. Other factually analogous cases where evidence was not suppressed include *Brenneman v. State,* 264 Ark. 460, 573 S.W.2d 47 (1978), *cert. denied,* 442 U.S. 931, 61 L. Ed. 2d 299, 99 S. Ct. 2863 (1979); *Blincoe v. People,* 178 Colo. 34, 494 P.2d 1285 (1972); *State v. Nine,* 315 So. 2d 667 (La. 1975); *Long v. State,* 532 S.W.2d 591 (Tex. Crim. App. 1975), *cert. denied,* 425 U.S. 937, 48 L. Ed. 2d 179, 96 S. Ct. 1670 (1976).

On the other hand, *Lorenzana v. Superior Court,* 9 Cal. 3d 626, 511 P.2d 33, 108 Cal. Rptr. 585 (1973), is a case where an officer overstepped his implied invitation and

---

stood on a drainpipe to get a better vantage point; after they saw heroin they broke down door and arrested all occupants); *People v. Cagle,* 21 Cal. App. 3d 57, 98 Cal. Rptr. 348 (1971) (officers attempting to serve warrant went to wrong house; one went to side and rear, far from all access routes; peered into bathroom and kitchen windows); *Huffer v. State,* 344 So. 2d 1332 (Fla. Dist. Ct. App. 1977) (officer outside his jurisdiction, not on legitimate police business, went into backyard at night and shone flashlight into a small tear in plastic covering greenhouse); *Olivera v. State,* 315 So. 2d 487 (Fla. Dist. Ct. App.), *cert. denied,* 330 So. 2d 21 (Fla. 1976) (officer at wrong apartment at night left sidewalk, walked across some grass, and went to back window where he put his ear to the opening and heard an incriminating statement; then broke in); *State v. Kaaheena,* 59 Hawaii 23, 575 P.2d 462 (1978) (officer on sidewalk next to building stood on a crate to enable him to look in top of window where there was a 1–inch gap); *Gonzalez v. State,* 588 S.W.2d 355 (Tex. Crim. App. 1979) (officer investigating poaching looked around residence, went down path to old "outhouse" far from house, shone flashlight inside through cracks).

unreasonably intruded on a constitutionally protected expectation of privacy. There an officer, looking for the suspect at night, went to the side of a house where there were no doors or defined pathway. He went there for the express purpose of looking into a window. He was not on the way to a door and his route was neither a normal means of access to either door nor was the land used in common by neighboring residences. The officer peered into the residence through a 2-inch gap between the drawn window shade and the sill, putting his face within an inch of the window. There he remained for a substantial period of time until he saw and heard incriminating evidence.

In the instant case, Sgt. Talvi did not spy into a residence. He merely looked at a greenhouse which was visible from both the parking area and the entire side yard including the area which, it was admitted, was the access route to the north door. It is evident from the map introduced by petitioners that the officer's route to the north door would have been a normal one to take if he had gone directly to that door from his car in the parking area. The officer was not secretive; rather, he acted openly in an honest attempt to talk with the occupants of the house. He did not get as close to the greenhouse as he could have; instead he kept his distance. The discovery was accidental in that he did not go to the residence with the purpose of viewing or looking for contraband. He did not create an artificial vantage point from which to advance his observation. Further, all acts occurred during daylight hours. The only act that seems open to challenge is that the officer appears to have strayed slightly from the most absolutely direct route between the two doors. It would be unreasonable to require, in every case, that police officers walk a tightrope while on private property engaging in legitimate police business. Absent such a requirement, we cannot say the limited deviation, within the open area, that occurred in this case was so unreasonable as to be an intrusion upon a privacy expectation deserving of Fourth Amendment protection under *Katz v. United States, supra.*

Such a conclusion does not conflict with or denigrate the holdings of our recent decisions in this area. In *State v. Daugherty,* 94 Wn.2d 263, 616 P.2d 649 (1980), we held that the seizure of a safe, which was spotted after police intruded into a constitutionally protected area while looking for evidence, was violative of the Fourth Amendment. In *State v. Chrisman,* 94 Wn.2d 711, 619 P.2d 971 (1980), *cert. granted,* ___ U.S. ___, 69 L. Ed. 2d 969, 101 S. Ct. 3106 (1981), an officer, having previously arrested one defendant, entered a dormitory room occupied by his roommate. The warrantless entry was made to look at a pipe and marijuana seeds. This court held that, there being no exigent circumstances for the initial entry into the room, the officer had no right to be where he was when he examined the contraband and seized it. The evidence was properly suppressed. *Chrisman* did not hold, however, that if the officer had seen the marijuana from his vantage point in the hallway, and had used that observation to obtain a search warrant, there would have been a violation of the defendants' constitutional rights. It is important to note that both *Daugherty* and *Chrisman* dealt with plain view seizures unsupported by prior justification for the officer's intrusion into the constitutionally protected area. Such was not the case here.

Petitioners also claim the officer's misidentification of tomato plants as marijuana was unreasonable and thus provided no probable cause to issue the warrant. They quote *United States v. Carmichael,* 489 F.2d 983, 989 (7th Cir. 1973), to support this position:

> If an agent *reasonably believes* facts which on their face indicate that a crime has probably been committed, then even if mistaken, he has probable cause to believe that a crime has been committed.

(Italics added in Brief of Petitioners, at 17–18).

The concept of probable cause requires the existence of reasonable grounds for suspicion supported by circumstances sufficiently strong to warrant a man of ordinary caution to believe the accused is guilty of the indicated crime. *State v. Henker,* 50 Wn.2d 809, 811, 314 P.2d 645

(1957). It is only the probability of criminal activity and not a prima facie showing of it which governs the standard of probable cause. *State v. Patterson,* 83 Wn.2d 49, 55, 515 P.2d 496 (1973).

The determination of whether there is probable cause to issue a warrant must be made by the issuing judge. "His is the duty to ascertain whether the warrant sought is being reasonably requested and on reasonable grounds." *State v. Patterson, supra* at 53. The determination of probable cause should be given great deference by reviewing courts. *Jones v. United States,* 362 U.S. 257, 270–71, 4 L. Ed. 2d 697, 80 S. Ct. 725, 78 A.L.R.2d 233 (1960); *State v. Smith,* 93 Wn.2d 329, 610 P.2d 869, *cert. denied,* 449 U.S. 873, 66 L. Ed. 2d 93, 101 S. Ct. 213 (1980). "[I]f in the considered judgment of the judicial officer there has been made an adequate showing under oath of circumstances going beyond suspicion and mere personal belief that criminal acts have taken place and that evidence thereof will be found in the premises to be searched, the warrant should be held good." *State v. Patterson, supra* at 58.

Here, the issuing judge was furnished with an affidavit which stated the affiant was a police officer who had observed marijuana both in plant and crushed leaf form for the past 8 years. After reiterating the circumstances of being on the property, the affiant stated he noticed the "hot house" with what appeared to be heavy drops of moisture on the inside of the plastic, and that through a 2–inch area of clear visibility on the plastic he observed what appeared to him as growing marijuana plants inside the hothouse. The affidavit was legally sufficient in that it stated more than a mere personal belief. It also stated the factual, underlying circumstances upon which that belief was premised. *See State v. Helmka,* 86 Wn.2d 91, 542 P.2d 115 (1975); *State v. Smith, supra.* The issuing judge found this to be factually sufficient and issued the search warrant. In doing so he did not abuse his discretion.

Petitioners assert, however, that even if the affidavit was facially sufficient to justify issuance of a search warrant

it must be quashed because of the misidentification. Their position ignores the holding and rationale of *Franks v. Delaware,* 438 U.S. 154, 57 L. Ed. 2d 667, 98 S. Ct. 2674 (1978). In *Franks* the court held that material factual inaccuracies which were "deliberate falsehood" or which were made in "reckless disregard for the truth" would result in the voiding of a warrant, but that lesser factual inaccuracies would not. "Allegations of negligence or innocent mistake are insufficient." *Franks,* at 171. *See also United States v. Carmichael, supra; accord, State v. Goodlow,* 11 Wn. App. 533, 523 P.2d 1204, *review denied,* 84 Wn.2d 1012 (1974); *see generally* LaFave § 4.4. This is wholly logical. The Fourth Amendment does not proscribe "inaccurate" searches only "unreasonable" ones. Kipperman, *Inaccurate Search Warrant Affidavits as a Ground for Suppressing Evidence,* 84 Harv. L. Rev. 825, 832 (1971).

There is nothing in the record to suggest the instant misidentification was other than an innocent mistake. There is no evidence the error was the product of intentional falsehood or the reckless disregard of facts. Indeed, petitioners have not contended such was the case. Given the undisputed facts and the clear direction of *Franks v. Delaware, supra,* that innocent or even negligent mistakes are insufficient to void a warrant or suppress the evidence, we conclude there was no error in admitting the results of the search.

The judgment is affirmed.

BRACHTENBACH, C.J., and ROSELLINI, UTTER, DOLLIVER, HICKS, WILLIAMS, DORE, and DIMMICK, JJ., concur.