# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
November 15, 2011 Session

## STATE OF TENNESSEE v. REBECCA DRAPER and J. C. DRAPER

**Appeal from the Criminal Court for Morgan County**
**Nos. 9390A, 9390B      E. Eugene Eblen, Judge**

---

**No. E2011-01047-CCA-R3-CD - Filed May 24, 2012**

---

The Defendants, Rebecca and J. C. Draper, were each indicted for one count of manufacture of .5 grams or more of methamphetamine, a Class B felony, and one count of possession of drug paraphernalia, a Class A misdemeanor.[1] See Tenn. Code Ann. §§ 39-17-417(a)(1), -425(a)(1). The Defendants filed a motion to suppress the evidence discovered as a result of a search of their manufactured home and backyard. The trial court denied the Defendants' motion. The Defendants then entered into a plea agreement with the State and reserved a certified question of law for appellate review pursuant to Tennessee Rule of Criminal Procedure 37(b)(2). Defendant Rebecca Draper pled nolo contendere to one count of possession of drug paraphernalia and was sentenced to eleven months and twenty-nine days on probation. Defendant J. C. Draper pled guilty to one count of promotion of methamphetamine manufacture, a Class D felony, and was sentenced to three years on probation. See Tenn. Code Ann. § 39-17-433. In this appeal, the Defendants contend that the trial court erred by denying their motion to suppress the evidence against them. Following our review, we reverse, vacate the judgments of the trial court, and dismiss the charges.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are
Reversed and Dismissed.**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR. and CAMILLE R. MCMULLEN, JJ., joined.

James W. Brooks, Jr., Wartburg, Tennessee, for the appellant, Rebecca Draper.

---

[1]Defendant Rebecca Draper was also indicted for one count of possession of a firearm with the intent to go armed during the commission of a dangerous felony, a Class D felony. See Tenn. Code Ann. § 39-17-1324(a).

C. Brad Neff, Jamestown, Tennessee, for the appellant, J. C. Draper.

Robert E. Cooper, Jr., Attorney General and Reporter; Nicholas W. Spangler, Assistant Attorney General; Russell Johnson, District Attorney General; and Frank A. Harvey, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

FACTUAL BACKGROUND

The charges against the Defendants arose from the March 21, 2007 search of their property located off of Deer Lodge Highway in Morgan County, Tennessee. The Defendants' manufactured home was located at the end of a gravel driveway just off of Deer Lodge Highway. Heavy brush and trees obscured the view of the manufactured home from the road and prevented any view of the backyard from the road. Heavy brush also obscured the view of the backyard from the end of the gravel driveway and the Defendants' front door. Additionally, the Defendants lived in a somewhat secluded area with no other residential homes nearby on their side of the street.

On March 21, 2007, Deputy Rick Hamby of the Morgan County Sheriff's Department was dispatched to the Defendants' address because "the water company [had] call[ed] in saying they had somebody stealing water." Deputy Hamby testified that when he arrived at the Defendants' residence, he parked in their driveway. Three employees from the "water company" were already there and showed Deputy Hamby "where the water meter used to be" near the road. Deputy Hamby testified that "somebody had tapped into" the water line with a "hose pipe." The hose went past some large bushes in the Defendants' front yard, through their front yard, around the home, and into the Defendants' backyard. Deputy Hamby testified that he and one of the water company employees "walked right straight down that hose line taking [] photos."

Deputy Hamby admitted that he made no attempt to knock on the Defendants' front door and see if they were home. Deputy Hamby was unsure if any of the water company employees had gone to the Defendants' front door. Deputy Hamby testified at the preliminary hearing that as he continued to follow the hose, and as he rounded the corner of the Defendants' home and entered their backyard, "gas was spewing." Deputy Hamby elaborated that he "smelled gas" and thought it was coming from a pipe "sticking up under the [back] porch, orange pipe with hoses coming off of it. Underneath the porch in the back of the steps." Deputy Hamby called the "gas company" and "walked up [to the back porch] and beat on the back door" to alert the Defendants about the gas leak.

While Deputy Hamby was at the Defendants' back door, he smelled "an odor" consistent with the production of methamphetamine coming from an open window. Deputy Hamby then contacted Deputy William Angel. Deputy Angel arrived at the residence and went into the Defendants' backyard. Deputies Angel and Hamby searched the backyard and discovered a "burn pile" which contained items used in the manufacture of methamphetamine. Deputy Angel then left the Defendants' property to apply for a search warrant. The pertinent part of Deputy Angel's affidavit reads as follows:

> I further make oath that on March 21, 2007, Deputy Ricky Hamby was dispatched . . . to assist Sunbright Utility Company in investigating an illegal water hookup. Deputy Hamby noticed an [odor] of natural gas at the residence and discovered that the gas line at the rear of the house was leaking. Hamby went to the back door to see if anyone was in the residence. A window wa[s] open beside the back door and from the window Hamby detected an odor that . . . is [consistent] with the production of methamphetamine. Deputy Hamby called for this affiant to come to the residence. Upon my arrival I went to the back of the residence and noticed the odor that . . . is [consistent] with the production of methamphetamine. While on said property we saw a burn pile behind the residence. In the burn pile I saw empty cans of [brake] clean[er] which had holes cut into the bottom of the cans, empty bottles of denatured alcohol and empty sudaphed (pseudo-ephedrine) package. Based on my training and experience I know that these items are used in the manufacture of methamphetamine.

At the suppression hearing, Deputy Hamby admitted that the odor he smelled that day was not actually natural gas. Instead, it was "[c]rude oil" from a well dug on the property. Deputy Hamby also admitted that the smell came from "some ten to [fifteen] feet out in the [back]yard." Deputy Hamby further admitted that he had previously seen "no trespassing" signs posted on the Defendants' property. However, Deputy Hamby testified that he could not recall if there were any "no trespassing" signs posted on March 21, 2007, but he stated that there "could have been."

At the end of the suppression hearing, the trial court concluded "that there [were] exigent circumstances and that the officer[] had the right to be where he was." In its written order denying the Defendants' motion to suppress, the trial court stated that it found "that exigent circumstances existed authorizing the entrance into the curtilage of the property by officers which led to observations by them forming the basis for probable cause leading to the issuance of the [s]earch [w]arrant." The trial court also stated that the evidence of "the garden hose running from the allegedly illegal water hook up to the rear of the [D]efendants['] residence would further justify entry leading to the evidence forming part of

the probable cause for said [s]earch [w]arrant." Beyond these statements, the trial court made no specific findings of facts.

As stated above, the Defendants each entered into plea agreements with the State and reserved the following certified question of law:

> Whether the scope and extent of a search by Deputy Hamby of the curtilage of the [D]efendant[s]' residence without a search warrant and solely for the purpose of investigating an alleged unauthorized water line tap violated [a]rticle I, [s]ection 7 of the Tennessee Constitution and the Fourth Amendment to the United States Constitution or falls within the exception created by exigent circumstances. During the search of the curtilage of Defendant[s], Deputy Hamby went to the rear of the residence and smelled natural gas leaking from a gas well line. The discovery of the natural gas leak purports to be the exigent circumstance. Deputy Hamby did not smell natural gas until he was clearly within the [curtilage] of the Defendant[s]' property.

## ANALYSIS

The Defendants contend that the trial court erred by denying their motion to suppress the evidence discovered as a result of the search of their manufactured home and backyard. The Defendants argue that their backyard was part of the curtilage of their home and protected from warrantless entry and search. The Defendants further argue that the smell of "gas" did not provide Deputy Hamby with an exigent circumstance to enter their backyard because he did not smell the "gas" until he was already behind their home and in their backyard. The Defendants conclude that Deputy Hamby's actions constituted an unreasonable search of the curtilage of their home because no other reason or exigent circumstance existed to justify his entry into their backyard. The State responds that Deputy Hamby did not need a warrant to enter the Defendants' backyard because the Defendants did not have a reasonable expectation of privacy in their backyard. The State also responds that Deputy Hamby's actions were "consistent with acceptable 'knock and talk' investigative procedure." The State further responds that, even if the Defendants had a reasonable expectation of privacy in their backyard, the fact that Deputy Hamby smelled "gas" provided an exigent circumstance to justify his actions.

### I. Standard of Review

On appellate review of suppression issues, the prevailing party "is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." State v. Talley,

307 S.W.3d 723, 729 (Tenn. 2010) (quoting State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996)). Questions about "the assessment of witness credibility, the weight and value of evidence, and the resolution of evidentiary conflicts are entrusted to the trial court" as the trier of fact. State v. Meeks, 262 S.W.3d 710, 722 (Tenn. 2008). When the trial court "makes findings of fact in the course of ruling upon a motion to suppress, those findings are binding on appeal unless the evidence in the record preponderates against them." Id. However, "when the trial court does not set forth its findings of fact upon the record of the proceedings, the appellate court must decide where the preponderance of the evidence lies." State v. Bobby Killion, No. E2008-01350-CCA-R3-CD, 2009 WL 1748959, at *13 (Tenn. Crim. App. June 22, 2009), perm. app. denied, (Tenn. Oct. 26, 2009) (citing Fields v. State, 40 S.W.3d 450, 457 n.5 (Tenn. 2001)). Here, the trial court failed to make any findings of fact in the record beyond the two conclusory statements found in its order dismissing the motion to suppress. Additionally, a trial court's conclusions of law along with its application of the law to the facts are reviewed de novo without any presumption of correctness. Meeks, 262 S.W.3d at 722.

Both the federal and state constitutions offer protection from unreasonable searches and seizures with the general rule being "that a warrantless search or seizure is presumed unreasonable and any evidence discovered subject to suppression." Talley, 307 S.W.3d at 729 (citing U.S. Const. amend. IV; Tenn. Const. art. I, § 7). As has often been repeated, "the most basic constitutional rule in this area is that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment–subject to only a few specifically established and well delineated exceptions.'" Coolidge v. New Hampshire, 403 U.S. 443, 454-55 (1971) (quoting Katz v. United States, 389 U.S. 347, 357 (1967)); see also State v. Berrios, 235 S.W.3d 99, 104 (Tenn. 2007). Such exceptions to the warrant requirement include "searches incident to arrest, plain view, exigent circumstances, and others, such as the consent to search." Talley, 307 S.W.3d at 729. These constitutional protections "are designed to safeguard the privacy and security of individuals against arbitrary invasions of government officials." Id. (quoting State v. Keith, 978 S.W.2d 861, 865 (Tenn. 1998)) (internal quotation marks omitted). Therefore, "a trial court necessarily indulges the presumption that a warrantless search or seizure is unreasonable, and the burden is on the State to demonstrate that one of the exceptions to the warrant requirement applied at the time of the search or seizure." Killion, 2009 WL 174859, at *14.

## II. Curtilage

The Fourth Amendment and article I, section 7 entitle the curtilage of a home "to the same constitutional protection against ground entry and seizure as the home." State v. Prier, 725 S.W.2d 667, 671 (Tenn. 1987). Our supreme court has long defined the curtilage of a

home as "the space of ground adjoining the dwelling house, used in connection therewith in the conduct of family affairs and for carrying on domestic purposes." Welch v. State, 289 S.W. 510, 511 (Tenn. 1926). More recently, our supreme court clarified that the curtilage is "any area adjacent to a residence in which an individual can reasonably expect privacy." Talley, 307 S.W.3d at 729 (citing Oliver v. United States, 466 U.S. 170, 180 (1984)). For almost half a century, the United States Supreme Court has declared that reasonableness is the "touchstone of the Fourth Amendment." Florida v. Jimeno, 500 U.S. 248, 250 (1991) (citing Katz, 389 U.S. at 360). As such, "the presence or absence of a reasonable expectation of privacy now informs in large measure the analysis of the extent of [the] curtilage." Killion, 2009 WL 174859, at *16.

To that end, the United States Supreme Court has determined that "the task of defining the extent of a home's curtilage . . . should be resolved with particular reference" to the following factors:

> the proximity of the area claimed to be the curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by.

United States v. Dunn, 480 U.S. 294, 301 (1987). These factors are not "a finely tuned" mechanical formula that "yields a 'correct' answer to all extent-of-curtilage questions," but instead, they are "useful analytical tools" that "bear upon the centrally relevant consideration–whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." Id.

In its brief, the State relies heavily upon the fact that the Defendants' home and backyard were not enclosed within a fence. This state's courts have repeatedly held "that police entry upon private, occupied, fenced land without a warrant and absent exigent circumstances is unreasonable and that evidence obtained as a result of such a search must be suppressed." State v. Harris, 919 S.W.2d 619, 624 (Tenn. Crim. App. 1995). However, the mere absence of a fence does not per se mean that the Defendants lacked a reasonable expectation of privacy in their backyard. In support of its argument the State cites this court's opinion in State v. Bobby Killion, 2009 WL 1748959. In that opinion, this court concluded that the defendant "did not enjoy the same expectations of privacy in his unfenced, readily viewable back yard as he did in his home." Id. at *17 (emphasis added). However, the facts of this case are readily distinguishable from the facts in Killion. In that case, a police officer testified that he could view the "backyard area" from the street and a group of police officers were able to view the entire backyard from the parking lot of an apartment complex behind the defendant's home. Id. at *16-17. This court concluded that there was

"no indicia" that the defendant "desired to shield the public from observing his back yard." Id. at *17. While the State asserts in its brief that the Defendants' backyard was "readily viewable," it is obvious from the record that this is not the case.

The evidence before us shows that the Defendants' backyard was well protected "from observation by people passing by." The Defendants' manufactured home was located in a secluded area at the end of a gravel driveway. There were no other residences near the Defendants' home, and the view of the home from the nearby road was greatly obscured by trees and heavy brush. The backyard was in no way viewable from the road. The Defendants' manufactured home was also flanked on both sides by heavy bushes and overgrowth. There is no evidence in the record to suggest that the backyard was viewable from the Defendants' front yard or front door. The gravel driveway did not extend into the backyard, and no paths or walkways led to the backyard. Additionally, Deputy Hamby testified that he had previously seen "no trespassing" signs posted on the Defendants' property. As such, this factor weighs in favor of the Defendants. We also note that the area Deputy Hamby entered was only a few feet from the side and back of the home. Therefore, the proximity of the area claimed to be the curtilage to the home also weighs in favor of the Defendants. As noted above, there was no fence surrounding the backyard or the home; therefore, this factor weighs against the Defendants. With respect to the nature of the uses to which the area is put, the backyard contained steps leading to a back porch and a back door. Photographs of the area showed a large amount of junk strewn across the area. However, there was no testimony about any specific uses for this area beyond its proximity to the home and the access to the home's backdoor. As such, we conclude that this factor neither weighs in favor nor against the Defendants. Based upon our review of the record and the Dunn factors, we conclude that the area that Deputy Hamby entered into was a part of the curtilage of the home and constitutionally protected from his warrantless entry.

*III. Knock and Talk Procedure*

The State also argues that Deputy Hamby's actions were "consistent with acceptable 'knock and talk' investigative procedure." This court has previously recognized the validity of the "knock and talk" procedure. State v. Cothran, 115 S.W.3d 513, 522 (Tenn. Crim. App. 2003). The procedure is considered to be a consensual encounter with the police and a means for police officers "to request consent to search a residence." Id. at 521. In explaining the "knock and talk" procedure and the reasoning for it, this court has quoted with approval the following:

> Absent express orders from the person in possession against any possible trespass, there is no rule of private or public conduct which makes it illegal per se, or a condemned invasion of the person's right of privacy, for anyone openly

and peaceably, at high noon, to walk up the steps and knock on the front door of any man's "castle" with the honest intent of asking questions of the occupant thereof-whether the questioner be a pollster, a salesman, or an officer of the law.

Id. (quoting United States v. Cormier, 220 F.3d 1103, 1109 (9th Cir. 2000)).

Put another way, any "sidewalk, pathway or similar passageway leading from a public sidewalk or roadway to the front door of a dwelling represents an implied invitation to the general public to use the walkway for the purpose of pursuing legitimate social or business interest with those who reside within the residence." Harris, 919 S.W.2d at 623. Accordingly, it "cannot be said a person has an expectation of privacy in the area in the front of his residence which leads from the public way to the front door." Id. (quoting State v. Baker, 625 S.W.2d 724, 727 (Tenn. Crim. App. 1981)). Whatever an officer sees in this area "is not protected by either the Fourth Amendment or the state constitution." Id. at 624. However, "[a]ny substantial and unreasonable departure from an area where the public is impliedly invited exceeds the scope of the implied invitation and intrudes upon a constitutionally protected expectation of privacy." Id. (quoting State v. Seagull, 632 P.2d 44, 47 (Wash. 1981)) (internal quotation marks and brackets omitted). Therefore, "once an officer has walked around the exterior of a dwelling . . ., the officer violates the mandate[s] of the Fourth Amendment and [a]rticle I, [s]ection 7." Id. Furthermore, the presence of a "no trespassing" sign "evince[s] an actual subjective expectation of privacy and a revocation of the 'implied invitation' of the front door." State v. Monty Blackwell, No. E2009-00043-CCA-R3-CD, 2010 WL 454864, at *7 (Tenn. Crim. App. Feb. 10, 2010).

The "knock and talk" procedure does not justify Deputy Hamby's incursion into the curtilage of the Defendants' home. Deputy Hamby was very clear in his testimony at the suppression hearing that he did not approach the Defendants' front door and made no attempt to contact them at the front door. Deputy Hamby could not recall if any of the water company employees attempted to contact the Defendants at their front door. Deputy Hamby also could not recall whether there were any other cars in the driveway when he arrived. Deputy Hamby testified that he bypassed the front door and simply followed the water hose into the Defendants' backyard. As such, Deputy Hamby left the area where the public was impliedly invited, exceeded the scope of the implied invitation, and intruded upon a constitutionally protected area. Furthermore, Deputy Hamby was aware that the Defendants' had posted "no trespassing" signs on their property, effectively revoking the implied invitation of the front door. Accordingly, we conclude that Deputy Hamby made no attempt to institute a "knock and talk" procedure and that the procedure provides no justification for his warrantless entry into the Defendants' backyard.

*IV. Exigent Circumstances*

The trial court denied the Defendants's motion to suppress because it concluded that there were exigent circumstances that justified Deputy Hamby's actions. Exigent circumstances "are those in which the urgent need for immediate action becomes too compelling to impose upon governmental actors the attendant delay that accompanies obtaining a warrant." State v. Meeks, 262 S.W.3d 710, 723. Put another way, exigent circumstances arise when "the needs of law enforcement are so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." Id. (quoting Brigham City, Utah v. Stuart, 547 U.S. 398, 403 (2006)) (internal quotation marks and brackets omitted). Exigent circumstances exist only when "the State has shown that the search was imperative." Id. Exigent circumstances frequently arise in the following situations: "(1) hot-pursuit, (2) to thwart escape, (3) to prevent the imminent destruction of evidence, (4) in response to an immediate risk of serious harm to the police officers or others, and (5) to render emergency aid to an injured person or to protect a person from imminent injury." Id.

In determining the constitutionality of a warrantless search, "the inquiry is whether the circumstances give rise to an objectively reasonable belief that there was a compelling need to act and insufficient time to obtain a warrant." Meeks, 262 S.W.3d at 723. "The exigency of the circumstances is evaluated based upon the totality of the circumstances known to the governmental actor at the time of the entry." Id. (emphasis added). The State "must rely upon specific and articulable facts and the reasonable inferences drawn from them" rather than on mere speculation. Id. at 723-24. Additionally, the "manner and the scope of the search must be reasonably attuned to the exigent circumstances that justified the warrantless search, or the search will exceed the bounds authorized by exigency alone." Id. at 724. When the asserted exigency is risk to the safety of the officers or others, "the governmental actors must have an objectively reasonable basis for concluding that there is an immediate need to act to protect themselves and others from serious harm." Id.

Deputy Hamby's testimony at the suppression hearing was clear that he did not smell anything until he had already entered the Defendants' curtilage and was in their backyard. In essence, Deputy Hamby created the exigency by entering into the Defendants' backyard. Such police-created exigent circumstances cannot be used to justify a warrantless entry into a constitutionally protected area. State v. Carter, 160 S.W.3d 526, 532 (Tenn. 2005). All Deputy Hamby knew prior to his entry into the Defendants' curtilage was that there was a water hose running from the water line to the back of the Defendants' home. Furthermore, Deputy Hamby admitted at the suppression hearing that he had not actually smelled natural gas. In the affidavit in support of the search warrant and at the preliminary hearing, Deputy Hamby stated that he smelled natural gas "spewing" from an open pipe beneath the

Defendants' back porch. However, Deputy Hamby admitted at the suppression hearing that he actually smelled crude oil coming from a well ten to fifteen feet behind the Defendants' home. Based upon the foregoing, we conclude that Deputy Hamby's false claim that he smelled natural gas while in the Defendants' backyard could not retroactively provide him with an exigent circumstance to enter the Defendants' backyard.

The trial court also concluded that the fact that there was a water hose running from the water line to the Defendants' backyard provided Deputy Hamby with a justification for entering the backyard without a warrant. As our supreme court has previously stated, "[e]ven though a felony has been committed and officers have probable cause to believe that they will locate incriminating evidence inside a residence, a warrantless entry to search for contraband or weapons is unconstitutional absent exigent circumstances." Carter, 160 S.W.3d at 531 (citing Payton v. New York, 445 U.S. 573, 587-88 (1980)). The United States Supreme Court has held that "an important factor to be considered when determining whether any exigency exists is the gravity of the underlying offense." Welsh v. Wisconsin, 466 U.S. 740, 753 (1984). Furthermore, "application of the exigent-circumstances exception in the context of a home entry should rarely be sanctioned when there is probable cause to believe that only a minor offense . . . has been committed." Id. While the water hose was evidence that an offense was being committed, it was a relatively minor offense. Nothing in the record suggests that the water hose caused an urgent need for immediate action which would have required Deputy Hamby to enter the backyard without a warrant. As such, we conclude that the water hose did not provide Deputy Hamby with an exigent circumstance to justify his warrantless entry into the curtilage of the Defendants' home.

### CONCLUSION

In consideration of the foregoing and the record as a whole, we conclude that the trial court erred in denying the Defendants' motion to suppress the evidence against them and we reverse, vacate the judgments of the trial court, and dismiss the charges.

_____
D. KELLY THOMAS, JR., JUDGE

-10-