# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 70338-2-I consolidated with |
| Respondent, | ) ) | DIVISION ONE |
| v. | ) ) | UNPUBLISHED OPINION |
| STEVEN H. HOVANDER, | ) ) | |
| Appellant. | ) ) | |
| STATE OF WASHINGTON, | ) ) | No. 70339-1-I |
| Respondent, | ) ) | |
| v. | ) ) | |
| STARLARE HOVANDER, | ) ) | |
| Appellant. | ) ) | FILED: June 13, 2016 |

TRICKEY, A.C.J. — Police conducting legitimate business in the manner of a reasonably respectful citizen may enter areas of private property that are impliedly open to the public. In this case, the totality of the circumstances support the trial court's conclusion that police investigating a tip on Steven and Starlare Hovander's property acted like reasonably respectful citizens and travelled only on areas of the property impliedly open to the public. Accordingly, the court did not err in denying the Hovanders' motion to suppress evidence and statements obtained as a result of the deputies' warrantless investigation.

## FACTS

In May 2011, Whatcom County Sherriff's deputies received an anonymous tip involving property belonging to the Hovanders. Based on observations made during an investigation of the property, the deputies obtained a search warrant. While searching the property they discovered a marijuana growing operation in the Hovanders' cabin. The Hovanders arrived during the search and Starlare made incriminating statements. The State subsequently charged the Hovanders with manufacturing a controlled substance.

Prior to trial, the Hovanders moved to suppress the evidence and statements obtained by the deputies, arguing that they were tainted by the deputies' initial unlawful investigation on the property. After a hearing, the court entered the following pertinent findings of fact:

### I. FINDINGS OF UNDISPUTED FACT

1. On May 27, 2011 deputies from the Whatcom County Sheriff investigated an anonymous tip regarding a marijuana growing operation in Glacier, Washington. The site of the suspected growing operation was in a trailer located on property belonging to Steve and Starlare Hovander. The deputies were familiar with the property and parked their vehicles in the lot of an adjoining condominium complex.

2. Deputies Paz, Bons[o]n, and Taddonio walked up a dirt driveway separating three cabins located at 10453 Mt. Baker Highway and an RV [(recreational vehicle)] park at 10443 Mt. Baker Highway. **There were no gates, fences, or "No Trespassing" or "Private Property" signs restricting their access to the RV park along this route and their path was impliedly open to the public.**

3. At the RV park, they viewed the interior of some vacant cabins and did not observe anything arousing their suspicions. They spoke with the occupant of a trailer, Steve Rhea, who advised that the Hovanders lived in one of the cabins on the adjoining property. He said one of the other

2

cabins was vacant and the third was being rented out to a woman and her children and was in the eviction process.

4. After speaking with Mr. Rhea, Deputy Taddonio and Deputy Bons[o]n walked back towards the access driveway they had used to enter the RV park. Deputy Paz had followed a fork in the driveway back into some adjoining woods behind the three cabins before returning to where the access driveway to the cabins veered off towards the RV park. When the deputies returned to Deputy Paz's location, he asked them if they could hear anything. All immediately heard the sound of [a] high output electrical fan.

5. All of the deputies had extensive experience investigating marijuana growing operations and knew that fans, like the one they heard, are routinely used in such operations to circulate air and to discharge the odor of the operation to where it is not likely to be detected. The three deputies walked along the driveway to the portion outside the front of the middle (vacant) cabin.

6. From this location, they were able to intermittently detect an odor they immediately recognized to be growing marijuana. Deputy Taddonio went to the front door of the cabin and observed that all its windows were completely covered and that there were items on the front porch that could be associated with growing marijuana. He could not detect the marijuana odor at the front door; but again smelled it when he stepped away from the house into the driveway. He surmised that the odor was coming from the direction of the chimney on the second floor.

7. The deputies then went to the adjoining Chair 9 restaurant where they used its telephone to secure a search warrant. **From the time they left their parked vehicles until they retreated from the front door of the middle cabin, the deputies did not open a gate, climb over a fence, or walk past or observe any signs restricting public access to their location. Their route was impliedly open to the public and they acted in the manner of any reasonably respectful member of the public who might be visiting or transacting business at the cabin.**

8. Two employees of Chair 9 testified that they were familiar with the location because they worked on [a] daily basis at the adjoining property. Both testified that there were no "No Trespassing" or "Private Property" signs or barriers restricting access to the cabins at the time the deputies executed the search warrant on the middle cabin. **The gates and signs were not put up until after defendants had been released from custody following their arrest.**

3

9. Steven Hovander testified as to the presence of several "No Trespassing" o[r] "Private Property" signs he had placed on the premises, as well as, a strand of wire he had strung across the driveway displaying a Private Property sign. He stated that the signs had been removed or stolen on several occasions and that he had put up over a dozen such signs.

## II. DISPUTED FACTS

1. Were there any No Trespassing or Private Property signs or barriers across the driveway when the deputies walked up the driveway and approached the cabins on May 27, 2011?

Answer: **No. The signs and barrier must have been missing on that evening.**[1]

The court concluded the deputies acted like "a reasonably respectful member of the public in approaching the front of this cabin along the normally perceived access route," "did not enter into any location that was not impliedly open to the public," and did not violate the Hovanders' privacy rights.[2] The court denied the Hovanders' motion to suppress the evidence and statements.

Following a bench trial on stipulated facts, the court convicted the Hovanders of manufacturing a controlled substance. We consolidated their appeals.

## ANALYSIS

The sole issue on appeal is whether the trial court erred in denying the Hovanders' motion to suppress the evidence and statements obtained following the deputies' alleged unlawful entry onto the property. In reviewing the denial of a motion to suppress, we review findings of fact for substantial evidence and conclusions of law de novo. State v. Mendez, 137 Wn.2d 208, 214, 970 P.2d 722 (1999). The challenged

---

[1] Clerk's Papers (CP) at 68-71 (emphasis added).
[2] CP at 71-72.

findings in this case are supported by substantial evidence, and the court did not err in concluding that the police acted lawfully during their warrantless investigation of the Hovanders' property.

Warrantless searches of property are per se unreasonable under the Fourth Amendment and article I, section 7 of the Washington Constitution, unless they fall within specific exceptions. State v. Myers, 117 Wn.2d 332, 337, 815 P.2d 761 (1991). For example, police conducting legitimate business and acting in the same manner as a reasonably respectful citizen may enter areas of private property, including the curtilage of a residence,[3] without a warrant if the areas are impliedly open. State v. Ross, 141 Wn.2d 304, 312-13, 4 P.3d 130 (2000). Legitimate police business includes investigating possible criminal activity. Ross, 141 Wn .2d at 314. If police lawfully present on property detect something with their senses, that detection does not constitute a "'search'" subject to constitutional protections. State v. Seagull, 95 Wn.2d 898, 901, 632 P.2d 44 (1981) (quoting 1 W. LaFave, Search and Seizure § 2.2, at 240 (1978)). However, a substantial and unreasonable departure from impliedly open areas, or a particularly intrusive method of viewing, "will exceed the scope of the implied invitation and intrude upon a constitutionally protected expectation of privacy." Seagull, 95 Wn.2d at 902-03.

In determining whether a portion of the curtilage and/or access routes to a residence are impliedly open to the public, courts must consider the totality of the circumstances. Seagull, 95 Wn. App. at 902-03. The use of fences, gates, and

---

[3] "Curtilage is the land immediately surrounding and associated with [a] home." State v. Chaussee, 72 Wn. App. 704, 711, 866 P.2d 643 (1994).

restrictive signage may affect the degree to which areas of curtilage and access routes are impliedly open. See State v. Johnson, 75 Wn. App. 692, 705-06, 879 P.2d 984 (1994) (fenced and gated property, with "No Trespassing" and "Private Property" signs, showed that access way was not open), review denied, 126 Wn.2d 1004, 891 P.2d 38 (1995); State v. Ridgway, 57 Wn. App. 915, 918, 790 P.2d 1263 (1990) (blocking long driveway with closed gate demonstrated subjective expectation of privacy in area beyond gate); State v. Chaussee, 72 Wn. App. 704, 709-10, 866 P.2d 643 (1994) (no trespassing signs alone do not create a legitimate expectation of privacy, especially without additional indicators of privacy expectations such as high fences, closed gates, security devices, or dogs). Also, a property is less likely to be impliedly open late at night. See State v. Gave, 77 Wn. App. 333, 338, 890 P.2d 1088 (1995); Ross, 141 Wn.2d at 314.

The totality of the circumstances in this case support the trial court's conclusions that the routes travelled by the deputies' were impliedly open, and that the deputies acted in a manner consistent with a reasonably respectful citizen. It is undisputed that the deputies entered the Hovanders' properties at dusk. The court found that there were no gates, fences, or signs restricting public access along the deputies' route. The court's findings on this point are supported by substantial evidence.

The court also found and/or concluded that the deputies travelled on a driveway and dirt road that were impliedly open to the public and acted "in the manner of any reasonably respectful member of the public who might be visiting or transacting

business at the cabin."[4] These findings and conclusions are supported by exhibits, including photographs and sketches of the deputies' routes, and undisputed testimony regarding the deputies' movements on the property.

The Hovanders argue, however, that the deputies' investigation "went far beyond what a respectful citizen would do."[5] They note that the deputies entered the property at dusk, did not immediately attempt to contact them, and "canvassed the entire property, even going into the woods and behind residences."[6] We are not persuaded.

While the investigation did occur at "dusk,"[7] the record clearly indicates it was still light out. The record also indicates that the deputies took reasonable routes across the property and made reasonable attempts to locate and contact the Hovanders given the information in the tip and their observations at the scene. The tip mentioned a trailer on the Hovanders' property. The deputies testified that the Hovanders' property included the cabin area *and* the trailer/RV park further up the driveway, but they did not know where the Hovanders' lived on the property.

When they did not see a trailer near the cabins but did "see trailers back in the back edge of the RV park,"[8] two deputies headed directly to the RV park where they contacted the park's caretaker. The caretaker told them that the Hovanders lived in one of the cabins the deputies passed on the way in. The deputies then returned to the cabins where they heard a fan and detected the odor of marijuana from their position in

---

[4] CP at 70 (Finding of Undisputed Fact 7).
[5] Appellant's Opening Br. at 12.
[6] Appellant's Opening Br. at 13.
[7] Report of Proceedings (RP) (Jan. 22, 2013) at 44.
[8] RP (Nov. 26, 2012) at 101.

the driveway. They then knocked on the Hovanders' door but no one answered. These actions were consistent with those of a reasonably respectful citizen.

The same is true of the third deputy's actions. He simply walked up a dirt road adjacent to the cabins looking for a trailer, saw nothing of interest, and returned to the driveway. Nothing in the findings or the record suggests that he left the impliedly open dirt road and driveway during his walk. Nor does anything in the findings or record suggest that, prior to recontacting the other deputies, he had reason to believe there was anyone presently in the cabins or that the Hovanders resided in one of them.

For the first time on appeal, the Hovanders contend specific actions of the deputies substantially and unreasonably departed from impliedly open areas or were unlawful observations made from "particularly intrusive vantage points."[9] We need not consider grounds for suppression that were not argued below. State v. Garbaccio, 151 Wn. App. 716, 731, 214 P.3d 168 (2009). Furthermore, the record does not support their claims.

For example, the Hovanders correctly note that the deputies saw black plastic lining the Hovanders' door through a hole left by a missing door handle. But this observation was made from a lawful vantage point and nothing in the record suggests that the officers did anything more than observe what could be lawfully be seen in open view. See Ross, 141 Wn.2d at 313 (officers may lawfully observe that which can be seen or detected from a lawful vantage point so long as they do not engage in a particularly intrusive method of viewing). Likewise, while the deputies looked in the

---

[9] Appellant's Opening Br. at 13.

8

windows of several abandoned trailers in the RV park and "viewed"[10] the back of the suspected cabin after concluding that the marijuana odor was coming from that cabin, nothing in the record indicates that they used a particularly intrusive method or vantage point to do so.

In short, the trial court did not err in denying the Hovanders' motion to suppress. Given that conclusion, the Hovanders' argument that Starlare's statements to police were tainted by the deputies' initial investigation also fails.

Finally, the Hovanders contend the trial court erred in denying their motion to suppress "without reviewing the warrant or its supporting affidavit."[11] But the Hovanders did not challenge the warrant or the supporting affidavit below. Rather, they contended the deputies' trespassed during their initial warrantless investigation and therefore any evidence seized pursuant to the subsequent search warrant was the product of unlawful police conduct and had to be suppressed. In these circumstances, the State had no burden to produce the warrant or the supporting affidavit and the court did not err by ruling in their absence.

Affirmed.

_____
Trickey, ACJ

WE CONCUR:

_____          _____
                                          Cox, J.

---

[10] CP at 69.
[11] Appellant's Opening Br. at 10.

9